381 So.2d 1126 (1979)
ESTUARY PROPERTIES, INC., Petitioner,
v.
Honorable Reubin O'd. ASKEW, Governor of the State of Florida, Honorable Bruce A. Smathers, Secretary of State of the State of Florida, Honorable Robert L. Shevin, Attorney General of the State of Florida, Honorable Gerald A. Lewis, Comptroller of the State of Florida, Honorable Bill Gunter, Treasurer and Insurance Commissioner of the State of Florida, Honorable Ralph D. Turlington, Commissioner of Education of the State of Florida, and Honorable Doyle Conner, Commissioner of Agriculture of the State of Florida, As Members, Together Constituting the Florida Land and Water Adjudicatory Commission; Board of County Commissioners of Lee County, Florida, Southwest Florida Regional Planning Council, Division of State Planning of the State of Florida, Environmental Confederation of Southwest Florida, Sanibel-Captiva Conservation Foundation, Inc., Caloosa Bird Club, Iona-McGregor Federation of Civic and Residents Association, Organized Fishermen of Florida, Inc., Lee County Conservation Association, Inc., Florida Wildlife Federation, Inc., George Wilson, and City of Sanibel, Florida, Respondents.
No. II-419.
District Court of Appeal of Florida, First District.
December 17, 1979.
*1128 Gary P. Sams of Hopping, Boyd, Green & Sams, William E. Williams and William H. Adams, III of Mahoney, Hadlow & Adams, Jacksonville, Howard S. Rhoads of Allen, Knudsen, Swartz, De Boest, Rhoads & Edwards, Fort Myers, for petitioner.
Robert L. Shevin, Atty. Gen., Martin S. Friedman, Asst. Atty. Gen., Tallahassee, David Gluckman, Crescent City, Fred P. Bosselman and Charles L. Siemon, Chicago, Ill., David E. Bruner, Marco Island, P. Kevin Davey of Douglass, Powell & Davey, Tallahassee, James T. Humphrey, Fort Myers, Neal D. Bowen, Sanibel, for respondents.
PER CURIAM.
Petitioner, Estuary Properties, Inc., (Estuary) petitions this court to review a final order of the Florida Land and Water Adjudicatory Commission (The Adjudicatory Commission) denying an appeal from a development order issued by the Board of County Commissioners of Lee County.[1]
Estuary applied to the Board of County Commissioners of Lee County for approval of a residential and commercial development of regional impact pursuant to Chapter 380, Florida Statutes. The development application involved 6,500 acres of land (largely wetlands) in a sensitive ecological environment. A major portion of the development consists of land known as the "Windsor Tract". Estuary is the assignee of Windsor.
In 1970, the Trustees of the Internal Improvement Fund of Florida, (Trustees) entered into a settlement agreement with Windsor which set the boundary line between the State and Windsor owned lands. The agreement provided that the Trustees would have no objections to Windsor, his successors or assigns, applying for and receiving a bulkhead line coincident with the boundary line under Chapter 253, Florida Statutes, a dredge and fill permit for a canal fifty feet wide just inside the bulkhead line under Chapter 253, and a dredge and fill permit for three or four navigational channels under Chapter 253 giving Windsor access to surrounding bays and bodies of water.
Estuary acquired lands to the North and West of the Windsor tract bringing the total acreage proposed for development to approximately 6,500 acres. About 2,800 acres in the coastal rim of the property is comprised of red mangroves. A natural berm or levee about six to eight inches higher than the surrounding land crosses the tract. Between that berm or levee and the salina (the line above which tides seldom rise) is a predominantly black mangrove forest (approximately 1,800 acres). The upland portion of the property which is above the salina consists of approximately 1,800 acres.
Estuary's development application proposed to deed back to the State the coastal areas seaward of the berm consisting of predominantly red mangrove forests; dig an interceptor waterway immediately landward of the berm running a distance of some 7.5 miles; use the fill from the interceptor waterway, plus the fill from some 27 lakes to be dredged on the site, to raise the elevation of the land remaining for development; and to construct, over a 25 year period, some 26,500 residential units to accommodate 73,500 people. To accomplish this, Estuary sought zoning permitting a density of 4.1 dwelling units per acre. Finally, and most importantly, the proposed development, including the interceptor waterway, required the use by Estuary of the 1,800 acres vegetated with black mangroves.
The development plan was submitted to the Southwest Florida Regional Planning Council (Council).[2] The Council's report contains a detailed analysis of the proposed development's impact on the environment and natural resources, population and housing, public facilities, transportation, public services, and the economy. The central concept of the proposed development concerned *1129 the use of the interceptor waterway, which along with a system of some 27 lakes, was designed to replace the functions of the destroyed black mangroves. However, the destruction of the black mangroves was clearly the most controversial part of the proposed development. The Council found that the design and performance of the interceptor waterway was based on a series of questionable assumptions which overlooked the complex mix of urban effluents that would be entering the waterways. Specifically, the Council found: "a. The SWFRPC staff and its consultants were not provided data necessary to determine the validity of claims concerning the scrubbing functions of the interceptor waterway. The proposed drainage concept is unproved because it has never been tested in actual usage nor has a pilot project of suitable scale been constructed, observed or monitored. The effectiveness of the proposed interceptor waterway in meeting water quality objectives has not been documented in an actual situation. * * *" The Council recommended that the application for development approval be denied.
After a series of public hearings, the Board of County Commissioners of Lee County denied the proposed rezoning and denied Estuary's application for development approval. The Board's development order is set forth below:
"* * * The Board of County Commissioners of Lee County, pursuant to Section 380.06, after due consideration of the consistency of this development with the Local Land Development Regulations, the report from the Southwest Florida Regional Planning Agency, the report from the County's staff and members of the public body, takes the following action:
"Denies the application as submitted by Estuary Properties, Inc., due to the following reasons:
"1. This body adopts the findings and recommendations submitted by the Southwest Florida Regional Planning Council, pursuant to the requirements of Chapter 380, Florida Statutes, and said findings and recommendations are incorporated by reference and made a part of this Order.
"2. The environmental impact caused by this development is not sufficiently predictable to address the proposed future buildout of the Estuaries at this time.
"3. The site of the proposed development is largely characterized as wetlands and is within and adjacent to environmentally sensitive areas, being the Estero Bay Aquatic Preserve and San Carlos Bay.
"4. Extensive site alterations will be required for the development which will result in the destruction of large acreages of mangroves and other wetlands vegetation and cause the alteration of a long established ecosystem.
"5. The proposed development will impose very significant and possible adverse demands on the fresh water resources of Southwest Florida. The ability to meet the potable water demands on a long-term basis has not been sufficiently documented. The alternate plans as presented by the applicant provide no hydrological data which insures the capacity to meet the domestic needs generated by the proposed project.
"6. The drainage system as proposed will create a potential negative water quality impact on San Carlos Bay and the Estero Bay Aquatic Preserve. The proposed interceptor waterway has never been tested in actual usage and it has not been shown that it will not create a negative water quality impact on the waters of Estero Bay and San Carlos Bay.
"7. The large boat traffic generated by this proposed development will have a negative quality impact on San Carlos Bay and the Estero Bay Aquatic Preserve.
"8. The user characteristics assumed for the proposed project have not been substantiated by documented information, resulting in the possible underestimation of the many impacts which are dependent upon the user characteristics. Acceptable documentation and commitments to support applicant's user characteristics have not been provided.
"9. Based upon data received, the proposed site is in a flood-prone area and evacuation *1130 of the people proposed for the project will place impossible demands upon an already impacted emergency evacuation route system. This potential congestion problem could prove critical to the health, welfare and safety of the area-wide residents until the programmed county and state roadway improvements are, in fact, implemented.
"10. The proposed development will have a negative impact on the emergency facilities of Lee County and upon the governmental facilities of Lee County.
"11. The residential acres set aside under the proposed plan, with the proposed density allocation, concentrates too many residents within this sensitive coastal wetlands area.
"12. The proposed development will cause the degradation of the water of Estero Bay and San Carlos Bay which would adversely affect sport fishing in the bays with the loss to the tourist industry, commercial fishing and shell fishing industry, resulting in an adverse economic impact on Lee County and the region.
"13. The proposed development will have a major negative impact on the area-wide transportation network. Expenditure of millions of dollars will be required to improve the roads to accommodate the traffic generated by the proposed development, and there are not sufficient funds available to make said improvements at this time.
"14. The applicant has underestimated the impact of the proposed development on the educational system of Lee County and the project will have a considerable negative impact on Lee County's educational system.
"15. The proposed development, because of its character, magnitude and location, will have a substantial adverse effect on the health, safety and welfare of the citizens of Lee County and this region.
"The following changes in the development proposal are necessary in order to make it eligible to receive a permit:
"1. Present an amended D.R.I. Application for development approval and supporting data to the Regional Planning Council and this body setting forth development plans for a community unit plan which includes RU-1, or RU-2, or townhouse and garden apartments, or a mixture thereof, with an overall gross density not to exceed two units per acre for the total property owned by the applicant and included in the application. This will allow approximately 12,968 residential units. Townhouse and garden apartments as used herein shall be defined as single family dwelling units constructed in a series or group of attached units with real property lines separating each unit. The application should include neighborhood-type commercial facilities and amenities normally associated with the density as set forth.
"2. Eliminate the proposed interceptor waterway and give consideration to a system of collector swales to deliver the drainage overflow over the marshland borders of the development in a condition so as not to violate applicable state water quality standards for the receiving bodies of water.
"3. Eliminate the dredge and fill marinas proposed for Hurricane Bay, Estero Bay, and the Westwind area.
"4. Present a proposal to aid Lee County in funding the cost of the impact the proposed development will have on the schools, roads, emergency services and recreational facilities required to accommodate the development.
"5. Include in the amended application sufficient property to accommodate schools, library facilities and fire stations necessary for the residents of the proposed development.
"6. Include adequate provisions for a sewage treatment system to serve the development with the facilities to be constructed in accordance with federal, state and county requirements. Include adequate plans for the disposal of solid waste generated by the proposed development with any disposal facility to be completed in accordance with federal, state and county requirements. The applicant will not be required to construct or operate such facilities unless it is determined that adequate service for the *1131 development will not be provided by a franchisee or some public entity.
"7. The capability of the water resources of the area to meet the potable water demands on a long-term basis must be sufficiently documented. Alternate plans should include hydrological data which insures the capacity of this resource to meet the needs generated by the proposed development without adversely affecting nearby consumers.
"8. To phase the development to coincide with the improvements which will be required to the roads and other public facilities necessary to accommodate the residents of the proposed development.
"9. Eliminate the destruction of large acreages of red and black mangroves forest within the proposed development site.
"10. Provide for the successful evacuation of the residents of the proposed development without overloading evacuation routes available to the residents of the area in the event of hurricanes.
"11. Provide adequate data and studies to determine the viability of future proposed drainage and water supply systems.
"12. To take the appropriate steps necessary to correct the adverse factors and findings hereinabove set forth and as delineated in the Southwest Florida Regional Planning Council's assessment. * * *" (emphasis supplied)
Estuary appealed the development order to the Adjudicatory Commission which is comprised of the Governor and Cabinet. The case was assigned to a hearing officer, who conducted a de novo hearing.
The hearing officer considered the principal issues which F.S. 380.06(8) and (11) required to be considered. He declined to consider the "taking issue" because that issue was determined to be a judicial question beyond the purview of the administrative hearing. Concerning the requirements of F.S. 380.06(8) and (11), the hearing officer found that the effect the development would have on the economy, housing, and energy resources of the region was little, if any, different than any other project to provide 26,500 housing units in the area would have; that the impact the development would have on water, sewer, solid waste disposal, public transportation facilities and other necessary public facilities was no different than any other development introducing 26,500 dwelling units in the area would have; that Lee County has a serious potable water problem which will be exacerbated by an increasing population and that whether this increase in population resides in the proposed development or elsewhere in the county will have little effect on the overall water problem, except that the proposed development's use of treated effluent would result in the development using water more efficiently than other developments where potable water is used for irrigation; that the statutory requirement to consider whether the development will favorably or adversely affect the ability of people to find adequate housing reasonably accessible to their places of employment is not as relevant to a housing D.R.I. as it would be to an industrial D.R.I. and that those employed at the proposed development would represent only a few people compared to the 73,500 residents; and finally that the development was consistent with local land development regulations. However, the hearing officer did find that the finding of the Board of County Commissioners of Lee County and the Southwest Florida Regional Planning Council that destruction of the black mangroves would have an adverse impact on the environment and natural resources of the region was supported by the record. Specifically, the hearing officer found that the evidence demonstrated that the black mangroves play an important function in the ecosystem; that the interceptor waterway which was designed to perform part of the function performed by the black mangroves was not capable of absorbing the nutrients that could be assimilated by the black mangroves to be replaced by the interceptor waterway let alone the balance of the black mangroves which Estuary proposed to destroy when the area was filled; and that the preponderance of the evidence was that the interceptor waterway as designed was *1132 not capable of assimilating the nutrients expected from the runoff of waters from the impermeable surfaces created by the proposed development. The hearing officer concluded that removing the black mangroves would greatly increase the risk to the surrounding bays of pollution; that pollution in the bays would have an adverse impact on the economy of the area (the bays provide fish and other economically related marine life); that requiring the landowner to refrain from such degradation of state owned waters was both a reasonable restriction on the use of his land and a requirement of Chapter 380; and that because the interceptor waterway was not shown to be capable of assimilating the nutrients entering it, its use would not prevent the degradation of the bay waters. The hearing officer considered that determination dispositive of the development order, denying the application.
However, the hearing officer mentioned some of the other reasons given by Lee County for denying the application and considered that some of those reasons standing alone, would constitute unreasonable restrictions on Estuary's use of its lands. In that regard, the hearing officer mentioned the requirement that Estuary conduct inordinately time consuming and expensive research into existing water quality in the Estero Bay system and the extent and capacity of the area aquifers and the requirement that Estuary limit its development to townhouses and garden apartments which the hearing officer concluded was not consonant with the evidence presented regarding the acceptable use to which the property could be subjected. The hearing officer stated that the requirement that Estuary present a proposal to aid Lee County in funding the cost of the impact of the proposed development on schools, roads, etc., was of questionable validity since impact fees have never been required of any other developer. Finally, the hearing officer stated that other requirements of the development order were so vague and indefinite that it was doubtful that Estuary could ascertain what it would be required to do to obtain approval. However, based on his conclusion that the proposed development would have an adverse impact on the ecology and economy of the area, the hearing officer recommended that the appeal be denied.
The parties filed exceptions to the recommended order. In his statement of exceptions to the recommended order, the hearing officer stated that once he decided against construction of the interceptor waterway and the destruction of the mangroves, there were no changes possible within the record to make the development eligible for approval. Thereafter, the Adjudicatory Commission entered its final order denying the application and adopting the hearing officer's recommended order and his statement of exceptions.
In their briefs, several of the respondents have rephrased the points here sought to be decided. However, we find the points as presented and phrased by petitioner to adequately frame the relevant issues. We will consider those points in the order presented and will state each as phrased by petitioner.
POINT I
I. The denial of Petitioner's application for development approval violates the provisions of Ch. 380, Fla. Stat. (1977) concerning developments of regional impact.
A. The conclusion of the hearing officer and the Adjudicatory Commission that removal of 1,800 acres of black mangroves from petitioner's property would cause degradation of water quality in the adjacent bays is not supported by, and is contrary to competent substantial evidence of record.
F.S. 380.06, Fla. Stat. 1977, requires that a developer file an application for development approval with the local government having jurisdiction. The local government then submits the application to the appropriate regional planning agency. The regional planning agency is required to review the application and to submit a report to the local government. In preparing its *1133 report and recommendations, the regional planning agency is required by F.S. 380.06(8), to consider whether, and the extent to which:
"(a) The development will have a favorable or unfavorable impact on the environment and natural resources of the region.
"(b) The development will have a favorable or unfavorable impact on the economy of the region.
"(c) The development will efficiently use or unduly burden water, sewer, solid waste disposal, or other necessary public facilities.
"(d) The development will efficiently use or unduly burden public transportation facilities.
"(e) The development will favorably or adversely affect the ability of people to find adequate housing reasonably accessible to their places of employment.
"(f) The development complies with such other criteria for determining regional impact as the regional planning agency shall deem appropriate, including, but not limited to, the extent to which the development would create an additional demand for, or additional use of, energy * * *."
If, as here, a proposed development of regional impact is not located in an area of critical state concern, the local government, in considering whether the development should be approved, is required by F.S. 380.06(11), to consider whether, and the extent to which:
"(a) The development unreasonably interferes with the achievement of the objectives of an adopted state land development plan applicable to the area;
"(b) The development is consistent with the local land development regulations; and
"(c) The development is consistent with the report and recommendations of the regional planning agency * * *."
Local government then issues an order based on its findings.
F.S. 380.07(2), provides for review of local government development orders by the Adjudicatory Commission. In conducting such a review, the Adjudicatory Commission, or hearing officer, is not bound by the record before the local government when, as in this case, a de novo review is conducted. (F.S. 380.07(3), (4)) As a result, the findings and conclusions of the hearing officer in this proceeding, which were adopted in their entirety as the final order of the Adjudicatory Commission, supersede the development order entered by Lee County, and to the extent that those findings and conclusions were not appealed, they have become the law of the case. (See, Hodges v. State Road Department, 171 So.2d 523 (Fla. 1965); Wurwarg v. Lighthouse Restaurant, 131 So.2d 469 (Fla. 1961).)
Since the hearing officer's findings with respect to most issues have become the law of the case, the only evidentiary issue remaining to be resolved on this appeal is whether, and the extent to which the "... development will have a favorable or unfavorable impact on the environmental and natural resources of the region." (F.S. 380.06(8)(a)) Consideration of that issue is further limited to the hearing officer's and the Adjudicatory Commission's determination that petitioner's proposed removal of 1,800 acres of mangroves from the property would adversely affect the environment and natural resources of the region by increasing the exposure of adjacent bays to pollution from upland runoff. Petitioner contends that such determination is not supported by competent substantial evidence and that the Adjudicatory Commission's Final Order should therefore be reversed.
In its application petitioner proposed to minimize any adverse effect on adjacent bays from storm water runoff by a multifaceted drainage system designed to accept and moderate the effects of a 100-year storm, including runoff from both the development and urban areas to the north. The drainage system would consist of 27 containment lakes with storm water overflows traveling by grassy swales to a large final "polishing" and dispersal water body: *1134 the "interceptor waterway." Additional water recharge, filtration and retention capacity would be provided by golf courses and other green space areas totaling over 250 acres. Finally, petitioner offered to preserve approximately 2,800 acres of mangroves, or 43% of the entire property, bayward of the interceptor waterway as a final scrubbing mechanism for waters leaving the development site. The total drainage system for the development would thus encompass approximately 3,500 acres.
The purpose of the upland system would be to prevent harmful concentrations of any heavy metals, pesticides, herbicides, and nutrients from reaching the interceptor waterway or the adjacent bays by retaining them in the lakes and swales for a sufficient length of time to be either assimilated or trapped in sediment on the lake bottoms. The interceptor waterway itself was designed to intercept runoff, remove dissolved nutrients by biological and chemical assimilation, and distribute overflow waters over a broad lateral front to the seaward mangrove and marsh areas.
However, the hearing officer reached the conclusion adopted by the Adjudicatory Commission, that, "... if [the mangrove] forest is removed pollution of [the] bays with urban runoff from the proposed development will be the concomitant result." He further concluded that "... introduction of additional nutrients, as well as harmful heavy metals from the proposed development will, absent the scrubbing effect of the mangrove forest if this forest is removed, result in the degradation of the waters of the adjoining bays."
Petitioner urges such conclusions to be without evidentiary basis and in fact contrary to the evidence. A decision by us in that regard is rendered unnecessary by our holdings as to other points, post.
B. The Adjudicatory Commission, Lee County, and the planning council required petitioner to meet an incorrect standard of proof and to carry an unconstitutional burden of proof.
The history and interpretations of F.S. 380.06, show that the creators of the development of regional impact process intended that governmental agencies balance the various impacts of a proposed development. The statute does not use the word "balance", but the Final Report of the ELMS Committee[3] which resulted in the adoption of Chapter 380, Florida Statutes, stated that:
"[P]olicies and implementing regulations were to be developed with a balanced view toward assuring the highest quality of known amenities and environmental protection consistent with a sound and economic pattern of well-planned development." (Emphasis in the original.) (Environmental Land Management Study Committee, Environmental Land Management: A Final Report and Recommendations, at 5 (December, 1973).)
Then Senator Robert Graham, a member of the ELMS Committee and a proponent of the Act, wrote:
"The Land and Water Management Act was not conceived nor represented as preservationist. Rather, it attempts to establish processes and administrative structures within which all factors can be balanced." (Graham, A Quiet Revolution: Florida's Future On Trial, The Florida Naturalist, at 149. (October, 1973).)
The Division of State Planning opined after the first year of the Act's operation that
"[T]he DRI concept provides the framework for balancing the positive and negative effects of new large-scale growth in the state." (Division of State Planning, Florida Department of Administration, Developments of Regional Impact: A Survey Report For The First Year, at 4 (1974).)
One commentator has stated:
"... [T]he duty of local government to consider regional impact involves more than mere mechanical compliance with procedural requirements. At the *1135 very least, it requires local government to evaluate seriously all evidence of regional impact, balance objectively the benefits and detriments, both regional and local, of the proposed development, and resolve satisfactorily genuine issues of state and regional concern." (Pelham, Regulating Developments of Regional Impact: Florida and the Model Code, 29 U.Fla.L.Rev. 789, 816 (1977).)
Indeed, it is clear from the language of the Act that a regional planning agency must balance the impacts in determining whether a development will have "favorable or unfavorable impact," will "efficiently use or unduly burden" certain public facilities and will "favorably or adversely affect" the availability of housing. (F.S. 380.06(8))
Such a balancing is required by the very fact that as reasonable people we know that to some degree every use of land, every felled tree and every structure has some impact on the environment.
The report and recommendations of a regional planning agency staff are essential to the objectivity of the entire development of regional impact process, because a county commission and the Adjudicatory Commission, which are composed of laymen, must rely heavily upon the staff's professional report and recommendations. Local government must consider, for instance, whether "the development is consistent with the report and recommendations of the regional planning agency... ." (F.S. 380.06(11)(c))
Sub judice, the Planning Council's report is replete with nebulous assessments in the form of factual determinations such as:
"The introduction of petrochemical[s] associated with boat traffic within the drainage collector canal (Interceptor Waterway) will further limit its viability as a water treatment system and limit its capacity to absorb nutrients, creating a further potential negative water quality impact in the Estero Bay Aquatic Preserve. The impact on the water quality of the Estero Bay Aquatic Preserve could be further aggravated by increased turbidity caused by an expected large number of boat traffic [sic] entering and leaving the marinas proposed within the development.
"These additional concerns buttress the staff's doubts about the viability of the proposed drainage system and resulting water quality impact." (Emphasis added.)
At another point the report stated:
"The Council's staff has concluded that the proposed dredge and fill operation for `The Estuaries' may have potential adverse impact on the water quality of San Carlos Bay and the Estero Bay Aquatic Preserve, adversely affecting the shellfish beds and fishing areas potentials of these bay systems." (Emphasis added.)
In preparing its report and recommendations the Planning Council staff clearly required Petitioner to carry the burden of overcoming such doubts and suspicions, concluding that
"[I]t is the applicant's burden to demonstrate that the destruction of over 1,200 acres of impounded mangroves will not have a significant negative impact on the Estero Bay Aquatic Preserve and San Carlos Bay. It is the SWFRPC staff's opinion that the applicant has failed to collect and analyze the data necessary to accomplish this endeavor." (Emphasis added.)
In other words, the Planning Council recommended against development approval because Petitioner failed to prove the absence of significant negative impacts sufficiently to overcome the Planning Council staff's doubts about the propriety of the project. The Planning Council's attitude toward the burden of proof is displayed even more graphically by the testimony of one of its consultants before the hearing officer:
"The proposed projects would lead to the elimination of considerable portions of mangrove habitat... . It should be shown conclusively that impounded black mangrove swamps are of no ecological significance to adjacent systems before development in such areas is undertaken."
*1136 Thus, the position of the Planning Council is that a private landowner has no private right to use his property unless he can prove that such will not impair a public benefit.
The Florida Supreme Court has indicated that placing the burden of proof on an applicant for a dredge and fill permit under similar circumstances would be unconstitutional. In Zabel v. Pinellas County Water and Navigation Control Authority, 171 So.2d 376, 378 (Fla. 1965), the Court stated:
"Appellants assert they were erroneously required by the Authority and the trial court to carry the burden of proof in showing no adverse effect upon the public interest. * * * Appellee, although assuming that appellants have the burden of proof, has ignored this issue and argues only there is evidence in the record to sustain the findings of the examiner. "The examiner, the Authority and the trial court apparently held the statute required appellants to prove the proposed fill would not materially affect adversely any of the eight specified public interests. It is not clear the statutes do in fact place the burden of proof upon the property owner but, if they do, such requirement would render the statute unconstitutional as to the facts of this case." (171 So.2d at page 378)
Both Lee County and the Adjudicatory Commission adopted the Planning Council's assignment of burden of proof to Petitioner. Lee County concluded, for example:
"The drainage system as proposed will create a potential negative water quality impact on San Carlos Bay and the Estero Bay Preserve. The proposed interceptor waterway has never been tested in actual usage and it has not been shown that it will not create a negative water quality impact on the waters of Estero Bay and San Carlos Bay." (emphasis added)
The hearing officer's Recommended Order, which was adopted by the Adjudicatory Commission, did not explicitly assign the burden of proof to Petitioner, but his report contained throughout such phrases as "potentially useful but untested", "questionable assumptions", "has not received the study", "raises serious questions", "remains questionable", and "since the proposed interceptor waterway as not shown to be capable... ." In the end, he found evidence of environmental harm, but that was clearly through the inability of Petitioner's evidence to satisfy the "questions" in his mind. That Petitioner was required to carry the ultimate burden of proof in order to use its property becomes clear from a review of the findings of fact and conclusion of law by the hearing officer. As above stated, there were six major areas of statutory inquiry: environment and natural resources, economy, public facilities, housing, energy, and policies of the regional planning agency. (F.S. 380.06(8)) The hearing officer found that Petitioner's proposal was satisfactory in four areas: economy, public facilities, housing, and energy. He found against Petitioner only on the questions of environment and natural resources and policies of the Planning Council. Neither he nor the Adjudicatory Commission purported to balance the positive impacts in four major areas against the negative impacts in the other two by assigning meaningful weights to the various impacts. Instead, Petitioner's application was denied because Petitioner failed to carry the burden of proof in every single area of inquiry. Such an all-or-nothing standard for Petitioner's use of its land places it entirely at the mercy of governmental caprice.
The doctrine has long been established in the jurisprudence of this state that a landowner has the right, subject to the police power of the state, to the use of his land. While it is true that in seeking to comply with statutory standards adopted under the police power of the sovereign, the property owner has the initial burden of demonstrating compliance with those standards, once that has been accomplished the burden shifts to the contestant. As stated in the Zabel case:
"If * * * the public interest will be impaired by the proposed use of the land the burden is on the objectors to demonstrate that fact." (171 So.2d at page 380)
In failing to balance the numerous factors involved, and in placing upon Petitioner the burden of proving that the public interest would not be impaired by its proposed use of its land, after it had adduced substantial competent evidence in support of its application as to each statutory requisite, the hearing officer, Lee County and the Adjudicatory Commission erred. To uphold the challenged order under those circumstances would deprive Petitioner of its constitutional right of due process.

*1137 C. The Adjudicatory Commission violated Ch. 380, Fla. Stat. (1977) by failing to indicate any changes in the development proposal that would make it eligible to receive the permit, thereby reaching an unduly restrictive result.
F.S. 380.08, provides in part that:
"(1) Nothing in this chapter authorizes any governmental agency to adopt a rule or regulation or issue any order that is unduly restrictive or constitutes a taking of property without the payment of full compensation, in violation of the constitutions of this state or of the United States." (Emphasis added)
* * * * * *
"(3) If any governmental agency denies a development permit under this chapter, it shall specify its reasons in writing and indicate any changes in the development proposal that would make it eligible to receive the permit." (Emphasis added)
The Adjudicatory Commission is a "governmental agency" to which those provisions apply. (F.S. 380.031(5))[4] The requirement that the Adjudicatory Commission specify changes which would make a development proposal eligible for approval indicates a legislative intention to give the entire review process a definite point of termination. Any other interpretation of the statute would expose a landowner to the treadmill effect of repeated denials without any indication from governmental agencies of changes in his proposal that would permit an economically beneficial use of his property. The potential for abuse, if such a construction is accepted, is readily apparent. County commissioners and the Adjudicatory Commission could entrap a developer in a virtual bureaucratic revolving door, until he finally collapses from financial exhaustion, or withdraws his application from simple frustration.
The wisdom of the legislature in requiring the denying agency to specify its reasons and indicate any changes in the development proposal that would make it eligible is graphically demonstrated by the instant case. An examination of the challenged order reveals no meaningful attempt to comply with that requirement. Although it is clear that Petitioner has been denied relief it is left to wonder what changes may be made to render its proposal eligible. The only condition which is crystal clear from the order is that the mangroves must be preserved.
The order does not comply with F.S. 380.08(3).[5]
POINT II
By rejecting Petitioner's request to develop its property, the state and Lee County have taken that property for a public purpose without payment of full compensation in violation of the Fourteenth Amendment to the United States Constitution, Article I, Section 9 and Article X, Section 6 of the Florida Constitution, and Section 380.08(1) Fla. Stat. (1977).
A. The orders of Lee County and the Adjudicatory Commission deny petitioner the right to make any economically *1138 beneficial use of its property in violation of the United States and Florida Constitutions, and Section 380.08(1), Fla. Stat. (1977).
The Fifth and Fourteenth Amendments to the United States Constitution forbid the taking of private property for public use without payment of just compensation. The Florida Constitution contains the same protections. Article I, Section 9 provides that
"No person shall be deprived of life, liberty or property without due process of law * * *."
and Article X, Section 6(a) states that
"No private property shall be taken except for a public purpose and with full compensation therefor * * *."
The constitutional guarantees serve not merely to protect title to property but also "* * * the right to acquire, use and dispose of it for lawful purposes * * *." (Kass v. Lewin, 104 So.2d 572, 578 (Fla. 1958))
The constitutionally protected right to make economically beneficial use of private property is recognized by F.S. 380.08(1), hereinabove quoted.
Thus, while government clearly has the right to expropriate private property for purposes beneficial to the general public, it cannot require a single property owner to bear the cost of such general benefits. This principle, which is the essence of the "property clauses" of the United States and Florida Constitutions, commands that the cost of public benefits be borne by the public.[6]
One cannot possibly read the record in this case, nor the challenged order, without concluding that the principal reason for the denial of Petitioner's application was to preserve mangroves which presently serve as a protective buffer for the Estero Bay Aquatic Preserve, adjacent bay systems, and public fishing grounds. Petitioner has been denied the right to use its property because that use would deny the public certain free benefits.
It has long been recognized by both federal and state courts that an unconstitutional taking of private property may result from an overly restrictive exercise of the state's police power.
A leading case is Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) wherein the Supreme Court held that the state could not prohibit the owner of mineral rights from mining coal. Justice Holmes, in the majority opinion, warned against the danger of expanding the scope of permissible regulation to the point where private property rights disappear:
"We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." (260 U.S. at page 416, 43 S.Ct. at page 160)
In holding the mining prohibition unconstitutional as applied, the Court emphasized that "[for] practical purposes, the right to coal consists in the right to mine it," and thus the law prohibiting mining operations rendered the owner's mineral rights virtually worthless. This "diminution in value" test has been since interpreted by other courts to mean that although government can regulate the use of private property for the public benefit, it cannot preclude the owner from all economically practicable uses.
This Court, in a case somewhat similar to the instant case, held that a landowner's submerged property had been unconstitutionally taken by the action of state agencies in preventing the landowner from obtaining a dredge and fill permit from the Army Corps of Engineers. (Askew v. Gables-By-The-Sea, Inc., 333 So.2d 56 (Fla. 1st DCA 1976)) In that case, this Court ordered the State to condemn the landowner's property and held that the State cannot:
"* * * after selling submerged land to private owners deny such owners the *1139 right to use those lands in the only way in which private ownership can be of any value ... [thereby rendering] the land totally useless so far ... as a private owner is concerned. This unlawful revocation of the [landowner's] permit ultimately resulted in the denial to the [landowner] of the right to use its land for private purposes." (333 So.2d at page 61)
The holding in the Gables-By-The-Sea case was similar to that in Zabel v. Pinellas County Water and Navigation Control Authority, supra. There the court held that denial of a permit to fill former sovereignty land constituted the taking of private property rights, and stated:
"* * * Those rights may not be arbitrarily denied and the owners deprived of the only beneficial use of their property without compensation." (171 So.2d at 381)
In Alford v. Finch, 155 So.2d 790 (Fla. 1963), an attempt by the Game and Freshwater Fish Commission to forbid hunting on the landowner's property, which had been administratively designated a game refuge was ruled unconstitutional. In finding an uncompensated taking of an "incident of ownership", the court stated:
"* * * If as is claimed, the chief value of the land * * * is the right of the owners to pursue the game thereon, then, obviously, where they are deprived of that right they are deprived of property and about all that is left to them is the privilege of paying taxes thereon. The state, by pre-empting the instant incorporeal hereditament appertaining to the appellees' isolated parcel of land and forbidding, without compensation, the enjoyment thereof, violates fundamental law. * * *" (155 So.2d at page 795)
The attempt by Lee County and the Adjudicatory Commission to effectively incorporate Petitioner's land in the Estero Bay Aquatic Preserve is no more permissible than the attempt by the state in the Alford case to include private property in a game refuge without the consent of or compensation to the owner.
The central policy issue that has confronted courts in applying the regulatory taking principle in a wetlands context has been the extent to which one or a few property owners can be forced to underwrite a state policy of shoreline and estuarial preservation designed to benefit the general public. The costs of benefits flowing to the public at large must properly be borne by the public. As one commentator has noted:
"If a legislature determines that the social costs imposed by unrestricted private development of wetlands outweigh the economic benefits of such development, the state may legitimately regulate wetlands development to achieve an efficient allocation of resources, but it should ordinarily compensate landowners for wealth redistributions resulting from the regulation imposed. (Note, State and Local Wetlands Regulation: The Problem of Taking Without Just Compensation, 58 U.Va.L.Rev. 876, 905-906 (1972)) (Emphasis added).
This principle is universally accepted in more traditional contexts of governmental taking and is, in fact, the essence of constitutional property rights. The true constitutional issue in this case is whether there has been a taking of Petitioner's property rights, not whether the public benefits of preserving mangrove wetlands outweigh the private injury to Petitioner. The Adjudicatory Commission has failed to indicate any meaningful changes in the proposed development that would enable Petitioner to make any economically beneficial use of its land and, in fact, observed that "... once the hearing officer decided against the construction of the interceptor waterway and the destruction of the mangroves, there were no changes possible within the record to make the development eligible for approval."
Repeatedly the record reveals a concerted determination to preserve the mangroves. The Development of Regional Impact Development Order of Lee County recited:
"Extensive site alterations will be required for the development which will *1140 result in the destruction of large acreages of mangroves and other wetlands vegetation and cause the alteration of a long established ecosystem."
That same order required a change in the development proposal to:
"Eliminate the destruction of such large acreages of red and black mangroves forest within the proposed development site."
The order of the Adjudicatory Commission recited:
"* * * Accordingly destruction of this large acreage of black mangroves will have an adverse impact on the environment and natural resources of the region.
* * * * * *
"The proposed findings of fact presented by Respondents detailing the ecological and economical value of the mangrove forest proposed for displacement by applicant are supported by the record and are consistent with the above findings. * *
* * * * * *
"The primary concern and the most serious objection to the development posed by the regional planning council involves the destruction of some 1,800 acres of mangrove forest * * *
* * * * * *
"Removing 1,800 acres of mangrove forest, which is presently serving as the protector of San Carlos, Hurricane, Hell-Peckish and Estero Bays * * * would result in greatly increasing these bays to the risk of pollution. * * *
* * * * * *
"* * * Here the introduction of additional nutrients * * * will, absent the scrubbing effect of the mangrove forest if this forest is removed, result in the degradation of the waters of the adjoining bays. * * *"
The mangrove forests are obviously valuable to the ecology and economy of the area surrounding the proposed development. Equally obvious, Lee County and the Adjudicatory Commission has determined to preserve those forests, as is their right so long as the property owner is compensated.
We therefore conclude that denial of the requested development permit cannot be sustained absent payment of full compensation to petitioner for the taking of the mangrove acreage lying below the salina, as contemplated by F.S. 380.08(1).
Petitioner next contends that:
B. Lee County and the Adjudicatory Commission were without power to deny Petitioner's vested development rights conferred by a valid and binding settlement agreement between the State and Petitioner's predecessor in title, and the denial of such rights violates the United States and Florida Constitutions and Sections 380.06(12) and 380.08(1) Fla. Stat. (1977).
Petitioner's reliance upon Askew v. Gables-By-The-Sea supra and Zabel v. Pinellas County Water Navigational Control Authority, supra, is misplaced. We find that contention to be without merit.
Finally, Petitioner challenges the constitutionality of F.S. 380.06(8), primarily on the grounds that the standards set forth therein are so vague as to deny due process and further that the statute constitutes a delegation of purely legislative powers. It is axiomatic that duly enacted statutes are presumed constitutional and that courts should not consider their constitutionality if the case may be decided on other grounds. Because we have resolved this case by considering other points, we refrain from discussing the constitutional attack, observing nevertheless that the Supreme Court of Florida has recently considered a similar controversy in Askew v. Cross Key Waterways and Askew v. Postal Colony Co., Inc., 372 So.2d 913, (Fla. 1978).
This cause is remanded to the Adjudicatory Commission for entry, within thirty (30) days from the filing of this opinion, of an order in accordance with F.S. 380.07(5) granting to Petitioner permission to develop, which shall include the use of the black mangrove acreage, and which said order *1141 shall be conditioned so as to terminate within thirty (30) days from its date in the event Lee County shall, within said thirty (30) day period, commence condemnation proceedings in the appropriate circuit court for acquisition of the mangrove acreage below the salina.
MILLS, C.J., and BOOTH and LARRY G. SMITH, JJ., concur.
NOTES
[1] See F.S. 380.07, particularly F.S. 380.07(5).
[2] Sometimes abbreviated SWFRPC.
[3] Environmental Land Management Study Committee, Environmental Land Management: A Final Report and Recommendations, December, 1973.
[4] See also F.S. 380.07(5).
[5] Although preservation of the mangroves was obviously uppermost in the minds of all Respondents, considering the application, neither the Council, Lee County, the Hearing Officer nor the Adjudicatory Commission ever unequivocally so stated. Had they done so the provisions of F.S. 380.08(1) would have been activated and this entire proceeding would have become needless.
[6] For a colorful, yet appropriate, discussion of a citizen's right to compensation for property taken for the public good see State Road Dept. v. Tharp, 146 Fla. 745, 1 So.2d 868 (1941).