399 So.2d 1374 (1981)
Bob GRAHAM, et al., Petitioners,
v.
ESTUARY PROPERTIES, INC., et al., Respondents.
No. 58485.
Supreme Court of Florida.
April 16, 1981.
Rehearing Denied June 16, 1981.
*1375 Jim Smith, Atty. Gen., Kendrick Tucker, Deputy Atty. Gen., and Richard A. Hixson and Thomas R. Tedcastle, Asst. Attys. Gen., Tallahassee, Julie O'Connor, Charles L. Siemon and Fred P. Bosselman of Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., James T. Humphrey, Fort Myers, David E. Bruner, Marco Island, Neal D. Bowen, Sanibel, David Gluckman, Tallahassee, P. Kevin Davey of Douglass, Davey & Cooper, and C. Laurence Keesey and Mary Clark, Tallahassee, for petitioners.
Gary P. Sams, Wade L. Hopping and Richard D. Melson of Hopping, Boyd, Green & Sams, Tallahassee, and Howard S. Rhoads of Allen, Knudsen, Swartz, DeBoest, Rhoads & Edwards, Fort Myers, for respondents.
Ann P. Gailis, Dept. of Justice Land and Natural Resources Division Policy, Legislation and Special Litigation Section, Washington, D.C., amicus curiae for United States.
Harry A. Stewart, Gen. Counsel and Gerald L. Knight, Asst. Gen. Counsel, Fort Lauderdale, amicus curiae for Broward County.
Robert A. Ginbsburg, Dade County Atty. and Stanley B. Price, Asst. County Atty., Miami, amicus curiae for Dade County.
Louis F. Hubener, Asst. Gen. Counsel, Tallahassee, amicus curiae for State of Florida Dept. of Environmental Regulation.
Robert G. Saberson, Delray Beach, amicus curiae for the City of Delray Beach and the Treasure Coast Regional Planning Council.
George G. Collins, Jr. and Anthony C. Soviero of Collins, Brown, Caldwell & Evans, Vero Beach, amicus curiae for Indian River County.
Henry G. Manne, Director and Distinguished Professor of Law, John H. Moore, Associate Director and Research Professor of Economics, Peter H. Aranson, Special Research Administrator and Research Professor, and John Metcalf, and John M. Olin Fellow, Law and Economic Center, University of Miami School of Law, Coral Gables, and Earl B. Hadlow, William H. Adams, III, Mark C. Taylor and James T.R. Jones of Mahoney, Hadlow & Adams, Jacksonville, Thomas G. Pelham, Professor of Law, amicus curiae in pro. per.
*1376 Parker D. Thomson, Jerold I. Budney and Douglas M. Halsey of Paul & Thomson, Miami, amicus curiae for Greater Miami Chamber of Commerce.
Gary D. Lipkin, Asst. Gen. Counsel, Washington, D.C., amicus curiae for National Association of Manufacturers of the United States of America.
Stephen T. Dean and Darryl M. Bloodworth of Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, Orlando, amicus curiae for the Florida Association of Realtors.
William L. Earl and Paul H. Amundsen of Peeples, Earl, Smith, Moore & Blank, Miami, amicus curiae for Deltona Corp.
Ronald A. Zumbrun and Thomas E. Hookano, Sacramento, Cal., and Raymond M. Momboisse and Chrisopher H. Collins, Washington, D.C., amicus curiae for Pacific Legal Foundation.
Robert M. Rhodes and Terry E. Lewis of Thompson, Messer, Rhodes, Vickers & Hart, Tallahassee, Gus Bauman, Washington, D.C.; Stephen W. Metz, Tallahassee, and Phillip S. Parsons of MacFarlane, Ferguson, Allison & Kelly, Tallahassee, amicus curiae for Florida Home Builders Association, National Association of Home Builders and Florida Chamber of Commerce.
Chesterfield Smith and Julian Clarkson of Holland & Knight, Tampa, amicus curiae for Florida Phosphate Council, Inc.
McDONALD, Justice.
This case is before the Court for review of a district court decision reported at 381 So.2d 1126 (Fla. 1st DCA 1979). We affirm in part and reverse in part.
Estuary Properties, Inc., owns almost 6,500 acres of land in Lee County on the southwest coast of Florida near Fort Myers. The site includes substantial wetlands along Estero, San Carlos, Hurricane, and Hell-Peckish Bays and is a sensitive ecological environment. Tidal waters flush daily through about 2,800 acres of predominantly red mangroves on the edge of the bays. Some 220 days a year these tidal waters move through the red mangroves into the predominantly black mangrove forest which covers approximately 1,800 acres that Estuary wants to dredge or fill. The remaining 1,800 acres begin at the salina and range from two to five feet above mean sea level. Only 526 acres of the total area have been identified as dry enough to be classified as nonwetlands.
On June 18, 1975, Estuary applied to the board of county commissioners of Lee County for approval of a development of regional impact (DRI) pursuant to section 380.06, Florida Statutes (Supp. 1974).[1] Estuary's plan provided for no construction on the 2,800 acres of red mangroves but contemplated destroying the 1,800 acres of predominantly black mangroves. In their place a 7.5 mile "interceptor waterway" would be constructed, and the fill from the waterway (and from twenty-seven lakes to be dredged) would be used to raise the elevation of the remaining land for construction. Estuary contended that the waterway and the lakes would replace the functions of the black mangroves in the ecosystem. Estuary's plan called for the eventual construction of 26,500 dwelling units with an estimated eventual population of 73,500, eleven commercial centers, four marinas, five boat basins, three golf courses, and twenty-eight acres of tennis facilities.
The development proposal was submitted to the Southwest Florida Regional Planning Council (SWFRPC), which prepared a report pursuant to section 380.06(8). Based on this report SWFRPC recommended that the board of county commissioners deny the application.
After public hearings, the board adopted the SWFRPC findings and recommendations and concluded, inter alia, that the proposed development would cause the degradation of the waters of Estero and San Carlos Bays. This degradation would adversely *1377 affect both the commercial fishing and shellfishing industries, as well as the sport fishing industry, resulting in an adverse economic impact on Lee County and the region. The board denied both the increase in zoning density and the application for development approval. The commissioners listed twelve conditions which would have to be met before they would approve a development order. The first condition was that Estuary submit an amended DRI application for development approval for a maximum density of two units per acre. Such density would allow Estuary to construct 12,968 residential units as well as commercial facilities. Other conditions included eliminating the destruction of such large acreages of mangroves[2] and giving consideration to a system of collector swales to deliver the drainage overflow over the marshland borders of the development in a manner that would not violate applicable state water quality standards for the receiving bodies of water.[3]
Estuary appealed this order to the Florida Land and Water Adjudicatory Commission pursuant to section 380.07, Florida Statutes (1973). After a five-day hearing de novo requested by the developer, the hearing officer found that destruction of the black mangroves would have an adverse impact on the environment and natural resources of the region. He concluded that the interceptor waterway would not adequately replace the functions of the mangroves and that removing them would greatly increase the risk of pollution to the surrounding bays, thus adversely affecting the area's economy. The hearing officer found that requiring the landowner to refrain from degrading state-owned waters was a reasonable restriction on this land required by chapter 380; consequently, he recommended denial of the appeal. The Land and Water Adjudicatory Commission adopted his recommendation and entered a final order denying the appeal.[4]
Estuary sought judicial review in the First District Court of Appeal. That court granted relief and remanded the case to the adjudicatory commission with instructions to enter an order granting Estuary permission to develop its property, including the mangrove acreage, unless Lee County commenced condemnation proceedings on the mangrove acreage lying below the salina. The adjudicatory commission and Lee County have sought review by this Court.
The decision of the district court is divided into two points. Simply stated they are:
I. Denial of Estuary's application for development approval violates the provisions of chapter 380, Florida Statutes (1973 and Supp. 1974).
II. Denial of Estuary's application constitutes a taking of private property for public use without compensation in violation of the United States and Florida Constitutions.

I.

A.
The district court found that chapter 380 requires a balancing of the interests of the state in protecting the health, safety, and welfare of the public against the constitutionally protected private property interests of the landowner. In this respect we agree with the district court. Although the act does not expressly mandate balancing, such legislative intent is clear from the stated purpose of the act[5] and the factors *1378 enumerated in section 380.06(8),[6] which the regional planning agency must consider in making a DRI recommendation. The act specifically states that private property rights are to be preserved. § 380.021, Fla. Stat. (1973). Therefore, the only way to logically and feasibly apply the act is by balancing the often conflicting interests according to the considerations listed in section 380.06(8).
The district court found that the adjudicatory commission had not balanced the considerations in section 380.06(8) nothing that the commission found favorably on four of the considerations and unfavorably on only two. According to the district court, the adjudicatory commission ruled against the development only because the commission found an adverse environmental impact would result and because the proposed development deviated from the policies of the planning agency.
There is no evidence, however, that the commission did not balance the factors. Balancing in an adjudicatory process does not always mean that four favorable considerations outweigh two unfavorable considerations. The legislature did not place specific values on each consideration listed in section 380.06(8). Thus, it would have been permissible for the hearing officer to determine that the adverse environmental impact and deviation from the policies of the planning council outweighed the other more favorable findings.[7]
In Askew v. Cross Key Waterways, 372 So.2d 913 (Fla. 1978), we stated that "[f]lexibility by an administrative agency to administer a legislatively articulated policy is essential to meet the complexities of our modern society." Id. at 924. Section 380.06(8) sets out guidelines for implementing the policies of the act. The guidelines may permit discretion on the part of the agency when balancing applicable considerations. See Florida State Board of Architecture v. Wasserman, 377 So.2d 653, 656 (Fla. 1979).

B.
The thrust of the district court's holding that denial of the DRI permit was improper is that the planning council and hearing officer applied an incorrect burden of proof. The court found that "the position of the Planning Council is that a private landowner has no private right to use his property unless he can prove that such will not impair a public benefit." 381 So.2d at 1136. In determining that this position placed an unconstitutional burden of proof on the landowner, the court relied on Zabel v. Pinellas County Water and Navigation Control Authority, 171 So.2d 376 (Fla. 1965).
In Zabel this Court held that the statute in question would be unconstitutional as applied if it required the appellants to prove the proposed landfill would not materially and adversely affect any of the eight specified public interests. Zabel is of limited *1379 value in the instant case because the facts differ significantly. In Zabel the property in question had been transferred from the state to the landowners by a conveyance which carried with it is a statutory right to bulkhead and fill the property purchased. The state's subsequent denial of the fill permit amounted to the state's reneging on its agreement. This Court found that the rights to dredge, fill, and bulkhead the land were the appellants' "only present rights attributable to ownership of the submerged land itself." Id. at 381. Denying those rights would have deprived the owners of the only beneficial use of their property. To then place the burden of proof on the owners to show that the dredging and filling would have no adverse impact on public interest would have been unconstitutional. When Estuary bought the property in question in this case, however, it did so with no reason to believe that the conveyance carried with it a guarantee from the state that dredging and filling the property would be permitted.[8]
There is also a significant difference between the initial findings in Zabel and the initial findings of the planning council in this case. In Zabel the Court did not find that any material, adverse effect on the public interest had been demonstrated. 171 So.2d at 379. In the instant case there is no question but that the proposed development would have an adverse environmental impact. The issue in the present case, then, is not whether an adverse impact exists, but whether the curative measures are adequate. Zabel stands for the proposition that the burden is on the state to show that an adverse impact will result if a permit is granted. Here the state clearly met that burden. The burden of proof then shifted to Estuary to prove that the curative measures are adequate. Once there is sufficient evidence of an adverse impact, it is neither unconstitutional nor unreasonable to require the developer to prove that the proposed curative measures will be adequate.
In holding that the state has the initial burden of showing that a proposed DRI will have an adverse impact in light of section 380.06(8), we do not ignore or alter the established rule of administrative law that one seeking relief carries the burden of proof. We simply reaffirm the rule that exercise of the state's police power must relate to the health, safety, and welfare of the public and may not be arbitrarily and capriciously applied. If the state denied a permit without showing the existence of an adverse or unfavorable impact, there would be no showing that the regulation protected the health, safety, or welfare of the public; without such a showing the denial would be arbitrary and capricious.
This brings us to the issue of whether or not Estuary met its burden of proving that the interceptor waterway would adequately cure the effect of the planned dredging and filling and of the destruction of the black mangroves. Because of the sensitive nature of the land, it was not unreasonable for the commission to place a great deal of weight on the environmental impact of the proposed development. There is sufficient competent substantial evidence in the record to support the finding of the commission that the interceptor waterway would not only fail to prevent an adverse environmental impact but would in fact pollute the surrounding bays. It may be that there was sufficient evidence to support the opposite conclusion, as Estuary suggests, but we will not substitute our judgment for a decision of the adjudicatory commission made within the ambit of its responsibilities and with due regard to law and due process. § 120.68(10), Fla. Stat. (1977). For the reasons stated above we hold that the district court incorrectly reversed the adjudicatory commission's finding that the proposed DRI would have an adverse impact on the region.

C.
In further support of its finding that denial of Estuary's permit violated chapter *1380 380, the district court found that the adjudicatory commission did not indicate any changes in the development which would make it possible for Estuary to receive the permit, as required by section 380.08(3), Florida Statutes (1973). The recommended order issued by the hearing officer and adopted by the commission did not contain any specified changes which would have placed the order in compliance with that section, and the adjudicatory commission simply adopted that order.
Appellants argue that denial of the appeal effectively reinstated the order of the Southwest Florida Regional Planning Council (SWFRPC) which contains twelve specific changes which Estuary must incorporate in its proposal in order to make it eligible to receive a permit. However, section 380.08(3) states that if any government agency denies a development permit it shall specify its reasons in writing and indicate any changes in the development proposal that would make it eligible to receive a permit. The adjudicatory commission, consisting of the governor and other state officers exercising administrative powers, is a state agency.[9]
It may be, as appellants urge, that the commission intended to adopt the changes specified by the planning council. If this were true, however, the commission's order should have expressly so indicated. Furthermore, the recommended order indicates that the hearing officer did not find that the changes specified by the planning council were adequate. The recommended order states that some of the requirements of the council are "so vague and indefinite that it [is] doubtful that Estuary could ascertain what it would be required to do to obtain approval." 381 So.2d at 1132. This language does not indicate an intention to adopt the planning council's changes in order to comply with section 380.08(3). The procedure before the hearing officer was a de novo review. Therefore it was incumbent upon the hearing officer to indicate any changes that would make the proposal eligible to receive a permit.
Failure of the adjudicatory commission to indicate the requisite changes was a procedural error on its part. Although the error did not necessarily render the decision incorrect, it impaired the fairness of the proceeding. Therefore, the district court should have remanded the case for further agency proceedings on that point and is now directed to so remand. See § 120.68(8), Fla. Stat. (1977).

II.
The second point upon which the district court based its decision was that denial of the permit constituted a taking of Estuary's property for a public purpose without compensation, in violation of the Florida and United States Constitutions.
Section 120.68(12)(c), Florida Statutes (1977), calls for the remand of a case to the agency if the reviewing court finds that the agency's exercise of discretion violated a constitutional or statutory provision. We disagree with the district court's conclusion that the facts as found by the agency[10] constituted a taking and therefore violated the constitution or section 380.08, Florida Statutes.
There is no settled formula for determining when the valid exercise of police power stops and an impermissible encroachment on private property rights begins. Whether a regulation is a valid exercise of the police power or a taking depends on the circumstances of each case. Some of the factors which have been considered are:
1. Whether there is a physical invasion of the property.
2. The degree to which there is a diminution in value of the property. Or stated another way, whether the regulation precludes all economically reasonable use of the property.

*1381 3. Whether the regulation confers a public benefit or prevents a public harm.
4. Whether the regulation promotes the health, safety, welfare, or morals of the public.
5. Whether the regulation is arbitrarily and capriciously applied.
6. The extent to which the regulation curtails investment-backed expectations.
See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); Newman v. Carson, 280 So.2d 426 (Fla. 1973); State Plant Board v. Smith, 110 So.2d 401 (Fla. 1959); Varholy v. Sweat, 153 Fla. 571, 15 So.2d 267 (1943).
If the regulation does not promote the health, safety, welfare, or morals of the public, it is not a valid exercise of the police power. Newman. Likewise, if the regulation is arbitrarily and capriciously applied it is an invalid exercise of the police power. Varholy. If the regulation creates a public benefit it is more likely an exercise of eminent domain, whereas if a public harm is prevented it is more likely an exercise of the police power. See State Plant Board. It would seem, therefore, that if the regulation preventing the destruction of the mangrove forest was necessary to avoid unreasonable pollution of the waters thereby causing attendant harm to the public, the exercise of police power would be reasonable. On the other hand, if the retention of the forest simply created a public benefit by providing a source of recreational fishing for the public, the regulation might be a taking.
Protection of environmentally sensitive areas and pollution prevention are legitimate concerns within the police power. Moviematic Industries Corp. v. Board of County Commissioners, 349 So.2d 667 (Fla. 3d DCA 1977). In the instant case, the adjudicatory commission found that the proposed development would cause pollution in the surrounding bays. Such pollution would affect the economy of Lee County. Therefore, the regulation at issue here promotes the welfare of the public, prevents a public harm, and has not been arbitrarily applied.
It may be, however, that a regulation complies with standards required for the police power but still results in a taking. This occurred in Pennsylvania Coal Co., upon which Estuary and the district court relied. In Pennsylvania Coal Co. the Court considered a Pennsylvania statute, passed to protect the public safety, which prohibited subsurface mining of coal if such mining would cause subsidence of the surface. The Court held that enforcement of the statute amounted to a taking which required compensation. In holding that the mining prohibition was unconstitutional as applied, the Court emphasized that the statute rendered the coal company's rights to subsurface minerals virtually worthless. 260 U.S. at 414, 43 S.Ct. at 159.
The district court apparently determined that prohibiting the destruction of the mangroves rendered Estuary's property "virtually worthless." In support of this determination, the court relied on three cases: Zabel v. Pinellas County Water and Navigation Control Authority, 171 So.2d 376 (Fla. 1965); Alford v. Finch, 155 So.2d 790 (Fla. 1963); and Askew v. Gables-By-The-Sea, Inc., 333 So.2d 56 (Fla. 1st DCA 1976), cert. denied, 345 So.2d 420 (Fla. 1977). Zabel has already been distinguished from the case at bar and Gables-By-The-Sea, Inc. can be distinguished on similar grounds. In both cases the landowners had bought submerged bottom lands from the state. In both cases denying the right to fill the land deprived the landowners of all reasonable use of their property. In both cases all of the owners' lands were submerged and were totally useless without the right to fill them.
The property owned by Estuary, on the other hand, is not entirely submerged although part of it is covered part of the time by tidal flows. Furthermore, Estuary did not purchase its property from the state. Estuary purchased the property in question *1382 from a private individual with full knowledge that part of it was totally unsuitable for development.
Estuary argues that without the interceptor waterway it can make no beneficial use of its property. This argument is supported mainly by the self-serving testimony of the president of Estuary, who stated that he did not "believe that we can economically survive" by building approximately one-half the number of units originally proposed and giving up the interceptor waterway.[11] Estuary offered no independent evidence to support this contention.
Simply because the interceptor waterway would increase the value of the property does not mean that disallowing it constitutes a taking. Nor is a taking established merely because Estuary may be allowed to build a development only half the size of its original proposal. We agree with the Wisconsin Supreme Court's observations in Just v. Marinette County, 56 Wis.2d 7, 201 N.W.2d 761 (1972), where that court pointed out the involvement of exceptional circumstances because of the interrelationship of the wetlands, swamps, and natural environment to the purity of the water and natural resources such as fishing. The court also noted the close proximity of the land in question to navigable waters which the state holds in trust for the public. Similar factors are present in the case at bar. We agree with the Wisconsin court that "[a]n owner of land has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injuries the rights of others." 56 Wis.2d at 17, 201 N.W.2d at 768.
We do not hold that any time the state requires a proposed development to be reduced by half it may do so without compensation to the owner. We do hold that, under the facts as found by the commission, the instant reduction is a valid exercise of the police power. As we have already pointed out, there was ample evidence for the commission to find that destruction of the mangroves and creation of the waterway would result in an adverse impact on the surrounding area. The owner of private property is not entitled to the highest and best use of his property if that use will create a public harm. Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962).
As previously stated, the line between the prevention of a public harm and the creation of a public benefit is not often clear. It is a necessary result that the public benefits whenever a harm is prevented. However, it does not necessarily follow that the public is safe from harm when a benefit is created. In this case, the permit was denied because of the determination that the proposed development would pollute the surrounding bays, i.e., cause a public harm. It is true that the public benefits in that the bays will remain clean, but that is a benefit in the form of maintaining the status quo. Estuary is not being required to change its development plan so that public waterways will be improved. That would be the creation of a public benefit beyond the scope of the state's police power.
The district court also relied on Alford v. Finch, 155 So.2d 790 (Fla. 1963). In Alford the state attempted to incorporate the landowners' property into a game preserve without compensation to or consent of the owners. As in Zabel and Gables-By-The-Sea, Inc., the basis for finding that a taking occurred was that the state action rendered the property virtually valueless. For the reasons stated above, that determination is not present in this case.
Underlying all of the cases involving the police power to regulate private property is the reasonableness of the regulation. In Alford, for example, the plaintiffs' land was required to be a game preserve while the lands of adjacent property owners were not. This requirement implicitly supports the unreasonableness of the regulation in that case. The landowners in Alford did not seek to alter their land so as to adversely *1383 affect their neighbors. They simply wanted to hunt on their land in the same manner as their neighbors. In those circumstances it was unreasonable to subject those landowners to such a total restriction on the use of their property. In distinguishing Alford from the instant case, we again stress the magnitude of Estuary's proposed development and the sensitive nature of the surrounding lands and water to be affected by it. In this situation it is not unreasonable to place some restrictions on the owner's use of the property.
Another factor which may be considered in determining the reasonableness of an exercise of the police power involves the investment-backed expectations of the use of the property. In Zabel and Gables-By-The-Sea, Inc., the property owners' investment was backed by the expectation that they would be permitted to fill the lands in question. This expectation was further supported in Zabel by a statutory right to fill which existed when the property was purchased. Estuary, on the other hand, had only its own subjective expectation that the land could be developed in the manner it now proposes. Estuary diligently and at considerable expense prepared development plans in an attempt to assure that its development would not adversely affect the environment. It recognized that it should not materially alter the property in a way that would have serious adverse impact on the surrounding area. The fact finder concluded that Estuary's plans do not accomplish this goal, and that the development would in fact be detrimental to the surrounding area.
This case is remanded to the district court of appeal with instructions to remand it to the Florida Land and Water Adjudicatory Commission with instructions to that commission to comply with section 380.08(3), Florida Statutes (1973), as set forth in this opinion.
It is so ordered.
SUNDBERG, C.J., and BOYD, OVERTON, ENGLAND and ALDERMAN, JJ., concur.
ADKINS, J., dissenting.
I would approve the opinion and decision of the District Court.
The motions for rehearing and clarification filed by attorneys for respondents, and replies thereto,
IT IS ORDERED by the Court that said motions be and the same are hereby denied.
SUNDBERG, C.J., and BOYD, OVERTON, ENGLAND, ALDERMAN and McDONALD, JJ., concur.
ADKINS, J., dissents with an opinion.
ADKINS, Justice, dissenting.
I would grant rehearing and approve the opinion and decision of the district court. I also believe the dissenting opinion by Justice Brennan of the United States Supreme Court in San Diego Gas & Electric Co. v. City of San Diego, ___ U.S. ___, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981), controls our decision in this case.
The type of property involved in the San Diego dispute is similar to that proposed for development by Estuary. San Diego Gas owned a 412-acre parcel of land in the northwest part of San Diego, California. Approximately 214 of these acres, located within an estuary known as the Los Renasquitos Lagoon, were low-lying lands which serve as a drainage basin for three river systems. About a third of the property was subject to tidal action from the nearby Pacific Ocean.
The master plan for the city of San Diego, adopted in 1967, designated nearly all of the area owned by San Diego Gas for industrial use. In 1973 the city council downzoned 39 acres of the company's property from industrial to agricultural use. The city also established an open-space plan that placed about 233 acres of the San Diego Gas parcel in the city's open space areas. The effect of these actions, like the denial of Estuary's D.R.I. application by the Land and Water Adjudicatory Commission and Lee County, was to restrict more than half of the company's land from any private development and reserve it for public purposes.
*1384 San Diego Gas filed suit in state court, alleging that the city had taken its property without just compensation in violation of the federal and state constitutions on the theory that the city had deprived it of the beneficial use of the property through the rezoning and adoption of the open-space plan. Although the trial court's judgment for San Diego Gas was initially affirmed, San Diego Gas & Electric Co. v. City of San Diego, 146 Cal. Rptr. 103 (Ct.App. 1978), the California Court of Appeal later reversed itself, in part because the company had not made application to use or improve the property nor had it asked the city what development might be permitted. San Diego Gas appealed to the United States Supreme Court, claiming that the Fifth and Fourteenth Amendments require the payment of compensation whenever private property is taken for public use. This is one of the issues we must resolve in deciding whether the denial of Estuary's D.R.I. application constitutes a taking of private property or a regulation of land use.
A five-member majority of the United States Supreme Court (Rehnquist, J., concurring) left the taking issue undecided in San Diego Gas and dismissed the appeal for lack of a final judgment. In his concurring opinion, Justice Rehnquist explained that if the appeal was from a final judgment, he would have agreed with the dissent. The four dissenting justices found that the California Court of Appeal rendered a final judgment when it held that no Fifth Amendment taking had occurred, and they went on to address the merits of the question presented. Their rule requiring the payment of just compensation when a police power regulation effects a taking should apply to the actions of the adjudicatory commission and Lee County in denying Estuary the beneficial use of its property. Five United States Supreme Court Justices agree on this principle.
The United States and Florida Constitutions prohibit the taking of private property for public use without the payment of just compensation. U.S.Const. Amends. V, XIV; Art. I, § 9, Art. X, § 6(a), Fla. Const. The difficulty arises in classifying a government regulation as either an unconstitutional taking of private property for public purposes or a permissible exercise of police power over land use. Recent United States Supreme Court cases have offered some guidelines in making such a determination.
Last term in Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), the Court declared that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, ... or denies an owner economically viable use of his land." Id. at 2141 (emphasis added).
The dissent in San Diego Gas provided this explanation:
Police power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property. From the property owner's point of view, it may matter little whether his land is condemned or flooded, or whether it is restricted by regulation to use in its natural state, if the effect in both cases is to deprive him of all beneficial use of it. From the government's point of view, the benefits flowing to the public from preservation of open space through regulation may be equally great as from creating a wildlife refuge through formal condemnation or increasing electricity production through a dam project that floods private property... . [G]overnment action other than acquisition of title, occupancy, or physical invasion can be a `taking,' and therefore a defacto exercise of the power of eminent domain, where the effects completely deprive the owner of all or most of his interest in the property.

(Emphasis added) (footnotes omitted).
These guidelines support the holding of the First District Court of Appeal that Estuary's property has been taken. By denying the D.R.I. application, Lee County and the adjudicatory commission deprived Estuary of the beneficial use of almost three-quarters *1385 of its property. This area, encompassing some 4,600 acres of red mangroves and black mangroves, is preserved for the public at the expense of the individual landowner.
According to the opinion of the district court "the principal reason for the denial of [Estuary's] application was to preserve mangroves which presently serve as a protective buffer for the Estero Bay Aquatic Preserve, adjacent bay systems, and public fishing grounds." Estuary Properties, Inc. v. Askew, 381 So.2d 1126, 1138 (Fla. 1st DCA 1979). Lee County and the adjudicatory commission have a right to preserve these mangrove forests, as long as the property owner is compensated. I agree with the district court's determination that the costs of such public benefits must be borne by the public.
Justice Brennan proposed the following rule in his San Diego Gas dissent: "[O]nce a court finds that a police power regulation has effected a `taking', the government entity must pay just compensation for the period commencing on the date the regulation first effected the `taking', and ending on the date the government entity chooses to rescind or otherwise amend the regulation." 101 S.Ct. 1287, 1307 (footnote omitted). The purpose of the compensation requirement is to place the landowner in the same monetary position as he would have occupied if his property had not been taken. Since Estuary must assume more than a fair share of the public burden by preserving its land from development, I would require the payment of just compensation to redistribute the economic cost from the individual property owner to the public at large.
Article I, section 2, (Declaration of Rights), Florida Constitution, in defining our "basic rights" contains the following: "All natural persons are equal before the law and have inalienable rights, among which are the right ... to acquire, possess and protect property... ."
The concern of public officials over environmentally endangered lands is a laudable one and is shared by all of our citizens. On the other hand, the right of an individual to own and enjoy property was one of the foundation stones on which our government was formed. As government grows the individual property rights diminish, for we focus our attention on the welfare of the majority at the expense, and ultimate destruction, of the property owner. If one foundation stone crumbles, our form of government will fall.
NOTES
[1] The Florida Environmental Land and Water Management Act of 1972, ch. 380, Fla. Stat. (1973 & Supp. 1974), has been amended subsequent to Estuary's application for a permit, but the changes do not affect the issues here.
[2] Under the board's suggested rezoning, Estuary would be allowed 2 units per acre to be built on an upland site, leaving the submerged mangrove forests undeveloped.
[3] Additional conditions were aimed at alleviating the serious impact of a development of this size on local water supplies, schools, roads, sewage treatment facilities, and other government services.
[4] Final Order of the Fla. Land and Water Adjudicatory Comm'n., Estuary Properties, Inc. v. Board of County Comm'rs., App.No. 7608 (Dec. 27, 1977).
[5] § 380.021, Fla. Stat. (1973).
[6] § 380.06(8) states:

Within 50 days after receipt of the notice required in paragraph (7)(d), the regional planning agency, if one has been designated for the area including the local government, shall prepare and submit to the local government a report and recommendations on the regional impact of the proposed development. In preparing its report and recommendations the regional planning agency shall consider whether, and the extent to which:
(a) The development will have a favorable or unfavorable impact on the environment and natural resources of the region;
(b) The development will have a favorable or unfavorable impact on the economy of the region;
(c) The development will efficiently use or unduly burden water, sewer, solid waste disposal, or other necessary public facilities;
(d) The development will efficiently use or unduly burden public transportation facilities;
(e) The development will favorably or adversely affect the ability of people to find adequate housing reasonably accessible to their places of employment; and
(f) The development complies or does not comply with such other criteria for determining regional impact as the regional planning agency shall deem appropriate.
[7] It is not clear that the hearing officer did find in favor of Estuary on four of the six statutory factors, but, even assuming that such findings were made, the hearing officer was not precluded from determining that the overall environmental detriment was so extensive that the balance weighed against approval of the proposed development.
[8] Estuary argued in the district court that a similar guarantee did exist when the land was purchased. The district court found that contention had no merit. 381 So.2d at 1140.
[9] § 120.52(1), Fla. Stat. (1977).
[10] The reviewing court cannot substitute its judgment for that of the agency on a finding of fact or the weight thereof. § 120.68(10), Fla. Stat. (1977).
[11] See n. 2 supra.