400 So.2d 66 (1981)
KEY HAVEN ASSOCIATED ENTERPRISES, INC., Appellant,
v.
BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND and Dept. of Environmental Regulation et al., Appellees.
No. TT-255.
District Court of Appeal of Florida, First District.
June 1, 1981.
Rehearing Denied July 13, 1981.
Mallory H. Horton, of Horton, Perse & Ginsberg, and David Paul Horan, of Taylor, Brion, Buker & Greene, Key West, for appellant.
Terry Cole and Kent A. Zaiser, Tallahassee, for appellees.
ROBERT P. SMITH, Jr., Judge.
Appellant Key Haven urges that the circuit court erred by dismissing, for Key Haven's failure to exhaust Chapter 120 *67 remedies in a licensing dispute, its inverse condemnation complaint against the Department of Environmental Regulation. Judge Hartwell's decision to abstain was the preeminently correct response to a litigant who sought extraordinary constitutional remedies after abandoning opportunities for wholly adequate administrative and judicial remedies within the Chapter 120 process. We affirm.
Between 1964 and 1968 the trustees of the Internal Improvement Trust Fund (IIF) sold Key Haven's president and predecessor in title 185 acres of submerged shallow flatlands in the Keys of Monroe County. The trustees reserved only fractional undivided interests in any petroleum and other valuable minerals beneath the bottomlands. The price was $300 per acre. In 1972, four years after the last purchase, Key Haven applied to the trustees for a permit to dredge 679,000 cubic yards of limerock from the bottom and to fill adjoining bottomlands with that material and 300,000 yards more, brought from elsewhere, to create a residential development of canalfront lots. Following a moratorium on all such permits, DER in April 1976 notified Key Haven of its intent to deny this one, and Key Haven sought and received formal Section 120.57(1) proceedings on its applications.
Before the DOAH hearing officer Key Haven contended that its dredge-and-fill proposal met the standards of Chapters 253 and 403, Florida Statutes (1975),[1] for preserving natural resources and water quality, but that in any event the State, having sold the submerged lands expecting they would be dredged and filled, was estopped to refuse the permit.[2] After an appropriate hearing the hearing officer entered a recommended order rejecting Key Haven's argument on both counts and recommending denial of the permit. The hearing officer found Key Haven had not shown that the project would satisfy Chapters 253 and 403  to the contrary, the project would "obliterate all aquatic life in this area"  and, though the IIF trustees assumed the bottomlands to be sold would be filled, as was lawful in those days without a State permit, and they were aware of the purchaser's plans, the State was not estopped to deny the permit because the trustees did not promise the purchaser a permit, or mislead him, or induce him to take any injurious action:
When the Petitioner purchased the subject property from the Trustees of the Internal Improvement Trust Fund, the Petitioner was not required to seek further dredge and fill permits from the State. When the Petitioner undertook to commence dredge and fill activities, there was, however, such a requirement. The Petitioner is not in a different position than any other landowner who has been affected by the statutory permitting requirements.
Following DER's adoption of the recommended order with little change, Key Haven had a clearly defined opportunity to appeal the DER order within the administrative *68 process. The Governor and Cabinet, sitting as the IIF trustees, hear appeals from DER permit denials. Section 253.76, Fla. Stat. (1977). Should the trustees' decision have been adverse, Key Haven would then have been entitled to a Section 120.68(1) district court appeal.
Key Haven was untempted by the direct review option. Instead of pursuing a permit or other remedies through those conventional forums, Key Haven filed a circuit court complaint alleging that the IIF trustees sold Key Haven's predecessor the submerged flatlands knowing and intending that he would dredge and fill to create canal front lots, and that DER's denial of the permit unconstitutionally[3] prevented all use of the property and constituted a taking for which compensation was payable as in eminent domain. Before the circuit court Key Haven sought to avoid contesting DER's denial of the permit while asserting, nevertheless, that the denial effected a taking. Key Haven summarized its position by argument in support of its motion for summary judgment:
The Plaintiff corporation and the Defendants deem it to be in the public interest to deny a development permit for the lands previously purchased from the Trustees with the understanding that those lands would be filled. The Plaintiff corporation does not seek to review the denial of the development permit, it, as well as the Defendants agree that such denial was necessary in light of the substantial and over-riding public interest in preserving the state's natural resources; however, the state must, in order to keep from defrauding the landowner be compelled by this Court to institute condemnation proceedings against the land.
In granting DER's motion to dismiss the complaint for Key Haven's failure to seek Chapter 120 remedies before the IIF trustees and, if necessary, a district court of appeal, Judge Hartwell cited Coulter v. Davin, 373 So.2d 423 (Fla.2d DCA 1979), holding that one's remedy for agency action which is unconstitutional in effect is by direct review in a district court rather than by collateral attack in a circuit court, and he cited Kasser v. Dade County, 344 So.2d 928 (Fla.3d DCA 1977), holding that a property owner cannot be heard to assert simultaneously that a zoning restriction is reasonable and that it is confiscatory by constitutional standards. Judge Hartwell found compelling parallels between those cases and this one:
The only distinction between Coulter and Key Haven is that the plaintiff in Key Haven seeks inverse condemnation whereas Coulter sought an injunction barring agency action against him. However, the actions were based on identical allegations  that agency action constituted an unconstitutional taking of land. Therefore, both actions were attempts to collaterally attack the particular agency's denial of a permit.
.....
The analogy between Kasser and Key Haven is clear. Key Haven seeks to circumvent the established review procedure for denial of a dredge and fill permit by DER by alleging agreement with that denial. Key Haven is thus in the same contradictory posture as Kasser  collaterally attacking action while asserting agreement with it.
Florida courts consistently have embraced the general principle that a party ordinarily will not be indulged a collateral attack on administrative action in circuit court when direct review by a district court of appeal is or was available under Section 120.68. Carrollwood State Bank v. Lewis, 362 So.2d 110, 113-14 (Fla. 1st DCA 1978), cert. den., 372 So.2d 467 (Fla. 1979); Metro Dade County v. Dept. of Commerce, 365 So.2d 432 (Fla.3d DCA 1978); School Board of Leon County v. Mitchell, 346 So.2d 562, 567-68 (Fla. 1st DCA 1977), cert. den., 358 So.2d 132 (Fla. 1978); State ex rel. Dept. of General Services v. Willis, 344 So.2d 580, 589-91 (Fla. 1st DCA 1977).
*69 The primacy of direct district court review under Chapter 120 is but an extension of the familiar principle, long antedating the Administrative Procedure Act of 1974, that all review processes afforded by the executive branch must ordinarily be exhausted before the judicial branch will consider intervention. See School Board of Flagler County v. Hauser, 293 So.2d 681 (Fla. 1974). The same principle limits the availability of district court review of action by the executive branch under Chapter 120.[4] In the APA context the exhaustion requirement assures that the branch constitutionally responsible for implementing the statutory scheme has had a full opportunity to reach a sensitive, mature, and considered decision upon a complete record appropriate to the issue; and that requirement produces an authentic decision by the executive which then may be reviewed comprehensively, on all appropriate issues, in a single judicial forum. See Rice v. Dept. of Health and Rehabilitative Services, 386 So.2d 844, 848 and (dissenting opinion) 854 and n. 6 (Fla. 1st DCA 1980); Escambia County Sheriff's Dept. v. Fla. Police Benevolent Ass'n, Inc., 376 So.2d 435, 436 (Fla. 1st DCA 1979), cert. den., 389 So.2d 1109 (Fla. 1980). The power of circuit courts to intervene is not dissolved by Chapter 120, but by judicial policy that power is reserved for use in situations irremediable by direct review, Willis, 344 So.2d at 590. Even when the facial constitutionality of a rule or statute is raised, that question is judicially determinable in the direct review process, e.g., Peoples Bank of Indian River County v. Dept. of Banking and Finance, 395 So.2d 521 (Fla. 1981); so when a party having Chapter 120 remedies seeks to raise such issues in collateral circuit court litigation, the court "should refrain from entertaining declaratory suits except in the most extraordinary cases ...," as when the constitutional legitimacy of the entire administrative inquiry is questioned. Gulf Pines Memorial Park, Inc. v. Oaklawn Memorial Park, Inc., 361 So.2d 695, 699 (Fla. 1978); Rice, 386 So.2d at 849.
Contending it was exempt from normal review processes before the IIF trustees and a district court, Key Haven says it was entitled to circuit court preemption because DER properly denied Key Haven the only remedy DER might have granted, and neither DER nor the trustees could grant the remedy Key Haven seeks in consequence of DER's lawful action, namely, full compensation for the lost "Manhattan"[5] Key Haven might have raised from the ocean floor by dredge and fill. Only the circuit court, says Key Haven, can order that proper remedy, hence its detour from the statutory review process.
Judge Hartwell correctly held that "Key Haven's assertions of satisfaction with the denial of the permit are inconsistent with its position that the same action constitutes an unconstitutional taking of its property." Compare Kasser, supra. Moreover, Key Haven is incorrect even in its premise that a district court of appeal could not on direct Chapter 120 review have granted Key Haven the only remedy Key Haven says it wants and is entitled to: an order that the State file condemnation proceedings. This court has undoubted power to order that precise remedy in lieu of a permit for the desired development project. Estuary Properties, Inc. v. Askew, 381 So.2d 1126 (Fla. 1st DCA 1979),[6]rev'd on other *70 grounds sub nom. Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla. 1981). The Second District Court of Appeal recognized that power in the district courts when deciding Albrecht v. State, 1981 FLW 724 (Fla. 2d DCA 1981), a case remarkably like this one, ending in the same result. Albrecht, 1981 FLW at 724:
Under the teaching of Coulter, appellants could have argued the question of whether the order of the Department of Environmental Regulation constituted a taking of their property without due process by law in the proceedings before the First District Court of Appeal... . To now allow them to assert it [in circuit court] under the guise of arguing that the taking was legal but that they were entitled to be paid for it would be to permit them to go through the back door. They could have made the same contention in the administrative proceeding, and the First District Court of Appeal could have required that any taking be compensated.
The administrative record that Key Haven declined to complete in this case could well have supported a district court determination of the taking issue. Although DER did not and the IIF trustees would not likely have discussed the permit issue in terms of whether denying it would be tantamount to "taking" Key Haven's submerged lands, the dominating element in Key Haven's argument, first for the permit and then for the "taking," was that the State impliedly promised to allow dredge-and-fill on the submerged lands it sold Key Haven's predecessor. Cf. Estuary Properties, supra. On that issue the hearing officer found against Key Haven on a record that may have been wholly sufficient to enable a judicial determination of whether a taking occurred. Both this court and the Supreme Court found the Estuary Properties record sufficient for that purpose. See also Peterson v. Dept. of Environmental Regulation, 35 FDOAH 77, 82, 84 (Fla. Admin.L.Serv., Inc. 1977), aff'd, 363 So.2d 872 (Fla. 1st DCA 1978).[7] And if the existing record were thought to be insufficient to permit such a finding, the district court might have ordered further evidentiary proceedings and findings by either the DOAH hearing officer or the agency, before or after resolving the nonconstitutional issues. Rice, supra, 386 So.2d at 850.
Because Key Haven made no attack on the facial constitutionality of any governing rule or statute, but simply attributed unconstitutional effect to the aborted agency decision, Coulter squarely supports Judge Hartwell's decision to reject Key Haven's collateral attack. Coulter, 373 So.2d at 428:
[W]e suggest that the point of analysis is to determine where the alleged constitutional violation occurred. If it is alleged to have occurred in the taking of action by the agency in the proceeding to which the plaintiff was a party, whether the violation be procedural or substantive, and whether the action be a rule, regulation, order, or some other form, the issue is foreclosed from consideration in circuit court as grounds for relief. (Emphasis added).
Our colleague's dissenting opinion, infra p. 74, suggests that the sounder approach to "constitutional issues growing out of agency action" is to allow their raising either in the administrative proceeding, with direct linear review in a district court, or by declaratory judgment or other proceedings in circuit court. In the case of constitutional issues "growing out of agency action" as *71 distinguished from those appearing on the face of a statute or rule, the suggested arrangement would contradict general principles which were announced very early in this court's APA experience and were later approved by the Supreme Court, Gulf Pines supra; Willis, supra; School Board of Leon County v. Mitchell, 346 So.2d 562 (Fla. 1st DCA 1977). And that arrangement would directly conflict with both Coulter, which foreclosed circuit court litigation on constitutional issues growing out of agency action that was remediable, if erroneous, by Chapter 120 processes; and with Rice, which held that the primacy of Chapter 120 processes should be respected even when a constitutional question appears on the face of the statute, unless collateral intervention is made necessary by the futility of agency proceedings, see Gulf Pines, or the untimeliness of eventual district court relief.
The dissenting opinion suggests that our decision here is contrary to the implications of Rice, which stated:
If there was no appeal from the agency action [on constitutional questions of statutory or rule validity], the policy behind res judicata is not served by foreclosing circuit court litigation on questions that could not have been effectively raised for decision by the agency. 386 So.2d at 848, n. 6.
This apparent misunderstanding of the quoted language stems from a failure to differentiate constitutional questions of facial statutory or rule validity, which an agency cannot decide, from constitutional questions which a party gleans from agency action on an issue clearly within its authority to decide, such as whether Key Haven shall receive a dredge and fill permit. Both Coulter and Rice involved questions of the former class: each involved the facial validity of a statute. Rice disagreed with Coulter's theme that such questions automatically qualify for collateral litigation in circuit court, and undertook to demonstrate why even those questions should if practicable be carried with the undivided case within Chapter 120 processes, to the exclusion of collateral circuit court litigation. The quoted Rice language simply suggested agreement with Coulter's result on its own facts  that res judicata should not bar circuit court litigation on independent questions of facial statutory or rule validity raised by a party who chose to accept the agency's action on all matters within its jurisdiction and who did not appeal to a district court the independent and latent constitutional question.
Key Haven's case obviously is not of the same class as Coulter and Rice. Key Haven gleans its constitutional question not from the terms of the governing statutes, Chapters 253 and 403, but from the agency's action applying those statutes (or, rather, from a subagency's action, Key Haven not having sought relief from the IIF trustees). Coulter squarely held that such constitutional issues "arising from administrative action" are not proper subjects for collateral circuit court litigation; Rice surely did not disagree. In such a case, the constitutional question is not independent of the agency's action on the merits, but is inseparable from it, and the constitutional question is necessarily phrased, ingeniously or ingenuously, as a variation of the affected party's original position on the nonconstitutional question. In response to Key Haven's claim that the circuit court should hear and determine the constitutionally rephrased question that Key Haven might have presented as a permit issue through Chapter 120 processes, we can only echo what the Second District said in Albrecht and Judge Hartwell said here: despite the ingenuity of Key Haven's contention, we cannot accept it as a rational exception to the principles of primary administrative jurisdiction and exhaustion of administrative remedies.
If doubtful minds still require additional reasons for guarding Chapter 120 processes from undue circuit court intervention, a moment's further reflection on the circumstances of this case, and the ramifications of possible circuit court litigation on Key Haven's constitutionally rephrased permit question, provides reasons enough. Key Haven pursued its permit through DER and then detoured to circuit court. But had *72 Key Haven instead sought direct review of DER's decision by the IIF trustees, and if necessary by a district court of appeal, the district court might have afforded a range of possible remedies that were entirely unavailable to the circuit court under Key Haven's strategy to achieve condemnation. On such a hypothetical appeal, even if it appeared to a district court that the State's only proper course was either to grant the permit exactly as requested or to acquire the property by eminent domain, at least that choice would have remained, and it is a choice that is properly reserved to the State. Estuary Properties, supra, n. 6. Cf. Dept. of Transportation v. Burnette, 384 So.2d 916 (Fla. 1st DCA 1980).[8] But here, Key Haven flatly asserted for strategic reasons that the permit was properly denied, and thereby reduced the circuit court's possible remedies to only one, an injunction requiring condemnation.
Exhaustion of administrative remedies and direct judicial review would have opened up still more possible alternative remedies for the wrong asserted by Key Haven. By eschewing the required appeal to the IIF trustees, Key Haven deliberately avoided asserting its estoppel claim to the very public officers whose conveyance-with-knowledge during the `sixties gave rise to that claim. Though the hearing officer found no factual basis for estopping the trustees, those officers themselves may have found sufficient moral if not legal suasion in Key Haven's claim of breach of faith, or fraud,[9] to offer a rescission of the sale or a permit for some less extensive development scheme, or the very permit desired by Key Haven, conditioned upon Key Haven acquiring the necessary U.S. Corps of Engineers permit.[10] And if the IIF trustees denied any such relief with what later appeared to a district court to be inadequate attention to Key Haven's claims, the court may have required the trustees to readdress the permit question in light of the court's own analysis of the record. The Supreme Court, acting as a court of direct linear review, ordered that sort of relief in Estuary Properties. This court ordered that kind of focused administrative reconsideration of an issue in Rice.
Our hypothetical review of various remedies that may have been available to Key Haven, had it pursued normal administrative and judicial remedies under Chapter 120, does not imply that Key Haven would have been granted any such relief. Key Haven's claim for a dredge-and-fill permit or for condemnation, based principally on a theory that the State impliedly promised and should not renege on granting the permit, was highly problematic, given the hearing officer's findings.[11] The point of our *73 surveying the rich variety of appellate remedies is rather to contrast them with the lone remedy, condemnation, that was made available in circuit court under the contorted "taking" allegations of Key Haven's complaint. And we make that point, not for its value in claiming this judicial "turf" for the district courts of appeal, but to suggest that administrative justice at its best is not judicial turf at all, and that remedies available only through Section 120.68 can, while achieving justice in a particular cause, measurably and permanently improve agency capacity to do justice.
In Florida, with judicial vigilance against standardless delegations of legislative power and with sensitive management of APA processes, an affirmative answer can now be given to the despairing question, "Is Judicial Restraint Possible in an Administrative Society?"[12] It has become evident that the district courts of appeal most fruitfully employ the APA's "impressive arsenal of varied and abundant remedies for administrative error"[13] when they use those remedies not to impose on administrators judge-made substantive decisions that were legislatively committed to the administrators, but rather to induce those administrators to make their decisions more nearly just, through deliberations appropriate to "the dignity and burden of their own responsibility."[14] Recently that most pilloried of all bureaucracies, the Department of Health and Rehabilitative Services, demonstrated its capability to change its mind on an important question of statutory construction because of evidence and arguments brought forward by APA processes.[15] Any court could have answered the question for HRS as a matter of law; but no court could have achieved with that result the added dignity, self-reliance and sensitivity that accrued to HRS as a result of making the decision itself.
Just recently the United States Court of Appeals for the Fifth Circuit, sitting en banc, decided that it is necessary even for a Section 1983 civil rights complainant to exhaust adequate and appropriate Florida administrative remedies, and the court eloquently restated all the sound reasons for remaining faithful to the exhaustion requirement: to avoid premature or unnecessary judicial labor, to assure agency action by the authentic agency head, to encourage improvement in agency decisionmaking processes, to afford remedies simpler and less expensive than court litigation, and to encourage a responsible autonomy in the executive branch of state government. Patsy v. Florida Int'l University, 634 F.2d 900, 911-12 (5th Cir.1981). The court's statement of one of those reasons seems *74 especially pertinent at this stage in the maturity of Florida's Administrative Procedure Act:

Third, a reasonable exhaustion requirement will improve the administrative process itself. Prompted by appropriate judicial decisions, the state administrative agency will have the incentive and be able to hone its procedures to comply with federal requirements, both procedural and substantive, without losing the advantage of the agency's expertise, its familiarity with local conditions and awareness of the impact of particular action on related areas, and its desire to correct errors of lower level functionaries within the agency. The proper roles of the officials within the agency will be solidified when the errors of lower level functionaries are corrected within the agency instead of by the courts.
The circuit court was correct in rejecting Key Haven's claim that Chapter 120 remedies previously available to it were inadequate for review of DER's order denying a dredge-and-fill permit, therefore requiring circuit court action. The Chapter 120 remedies plainly were adequate, and the circuit court correctly declined "to employ an extraordinary remedy to assist a litigant who has foregone an ordinary one which would have served adequately." Willis, 344 So.2d at 592-93.
AFFIRMED.
SHAW, J., concurs.
BOOTH, J., dissents, with opinion.
BOOTH, Judge, dissenting:
The majority holds that appellants are without a remedy because of their failure to appeal the agency's denial of a permit and to raise, in connection with that permit appeal, constitutional issues. Prior decisions of this court have allowed the raising of constitutional issues in administrative proceedings,[1] but none to date have made it a mandatory substitute for the right to file in inverse condemnation in the Circuit Court. If this is to be the law of Florida by interpretation of Coulter v. Davin, 373 So.2d 423 (Fla. 2d DCA 1979),[2] it is law that has developed after appellants' right to appeal the denial of the permit had expired in 1977. Appellants' right to appeal in the permitting proceeding also expired prior to the effective date of Florida Statutes, Section 253.763,[3] which provides a remedy for taking of private property through the permitting process.
The better reasoned and sounder approach to the raising of constitutional issues growing out of agency action is to allow the proponent of those issues to raise them on appeal from the administrative proceeding or by suit for declaratory or other relief in the Circuit Court. It is only when the proponent of those issues has obtained a judicial determination that the doctrine of res judicata is applicable as was held in Rice v. Department of Health & Rehabilitative Services, 386 So.2d 844, 848 at note six (Fla. 1st DCA 1980):
If there was no appeal from the agency action, the policy behind res judicata is not served by foreclosing circuit court litigation on questions that could not have been effectively raised for decision by the agency.
*75 Florida Statutes, Section 120.73, expressly affords "the right to a proceeding in the Circuit Court in lieu of an administrative hearing," and preserves the jurisdiction of the Circuit Court to render declaratory judgments under Florida Statutes, Chapter 86. Obviously, Section 120.73 has little or no meaning if constitutional issues must be raised in the administrative proceeding and appeal taken under Section 120.68 or otherwise foreclosed.
In the instant case, the complaint for declaratory relief and inverse condemnation alleges that the predecessor in title of appellants purchased, in 1964, 1965, and 1968, submerged lands in a sale approved by the then "Board of Conservation," and that this land was sold by the State "for the purpose of being dredged and filled so as to create canal-front residential lots;" that the price paid for the land was based on the aforesaid purpose; and, finally, that the State has totally denied to the plaintiff any use of the property for that purpose or for any other purpose. Thus, the State, which sold the property with the approval of the Board of Conservation more than 15 years ago, has now changed its mind about allowing development.
Under the majority view, appellants, by hindsight, should have pursued their constitutional claim to inverse condemnation in four separate forums, two of which have no authority whatsoever to decide such a claim. Thus, appellants should have: (1) made a record to support their constitutional claim before the administrative hearing officer in the permit hearing; (2) appealed to the agency the hearing officer's recommended denial of the permit and raised the constitutional issue; (3) appealed to the District Court of Appeal the denial of the permit and sought an initial ruling on the constitutional issue based on the record made before the agency; and (4) finally, if successful in that appeal, obtained the filing of condemnation proceedings in the Circuit Court, followed, in all probability, by (5) a second appeal to the District Court of Appeal from the condemnation proceedings. Also, as mentioned by the majority, there could be remand(s) by this court to the agency to hold further hearing(s) and to determine additional facts needed for this court's decision on the constitutional issue.
Only litigants with limitless time and resources can afford this type of administrative "exhaustion." It is not required where, as here, the administrative forum is not empowered to determine the issue presented or to give the relief sought.
This court's affirmance of dismissal of the complaint leaves appellants with bare title to 184 acres of submerged land. The State, while resisting the constitutional claim for compensation, retains both the original $55,000 sale price paid and the beneficial use and enjoyment of the property on behalf of the public. One who bought property from a private individual under these circumstances would not be left without a remedy by the courts; neither should appellants. In Askew v. Taylor, 299 So.2d 72, 74 (Fla. 1st DCA 1974), this court stated:
The Supreme Court, almost a century ago, held that "common honesty is quite as respectable on the part of the State as in an individual, and hence the State will be honest and not repudiate."
I respectfully dissent.
NOTES
[1] Chapter 253 provided that the IIF trustees (and DER when it assumed such functions in 1975) should not issue dredge and fill permits unless studies demonstrated that the project would not interfere with the conservation of natural resources or destroy shellfish beds or marine nursery and feeding grounds. The trustees also were required to consider other factors affecting the public interest in reaching their decision. Sections 253.123(2)(d), 253.124(2), Fla. Stat. (1975). Chapter 403 and implementing standards regulated construction projects that would reduce the quality of water below the classification established for them or otherwise would potentially harm human health and welfare or animal and plant life. Section 403.088(1), 403.031(2), Fla. Stat. (1975).
[2] As paraphrased by the hearing officer's recommended order, Key Haven argued:

[T]he Trustees of the Internal Improvement Trust Fund, when they approved the sale of the subject submerged property to the Petitioner [Key Haven], made an implicit determination that the project would be in the public interest, and would not adversely affect the water quality or natural resources of the area. Petitioner argues that since the Trustees made these findings, and sold the property with the belief and understanding that it would be filled, a contrary determination at a later date cannot be sustained.
[3] Article X, Section 6, of the Florida Constitution provides: "No private property shall be taken except for a public purpose and with full compensation therefor... ."
[4] Generally, before the district court will entertain review under 120.68, Florida Statutes, a challenger of agency action must avail himself of such additional appeals within the executive branch as are provided by statute. See Friends of the Everglades v. State Dept. of Environmental Regulation, 387 So.2d 511 (Fla. 1st DCA 1980); Peterson v. State Dept. of Environmental Regulation, 350 So.2d 544 (Fla. 1st DCA 1977); Booker Creek Preservation, Inc. v. Dept. of Environmental Regulation, 369 So.2d 655 (Fla. 2d DCA 1979).
[5] The record of a 1975 conference shows that Key Haven's president, when asked by state officials if he would consider selling the submerged land back to the State for the price he paid for it, responded that reversing the sale "would be like having bought Manhattan for $24 worth of jewelry and selling it back now for the same price."
[6] Estuary Properties, 381 So.2d at 1140-41:

This cause is remanded to the Adjudicatory Commission for entry, within thirty (30) days from the filing of this opinion, of an order in accordance with F.S. 380.07(5) granting to Petitioner permission to develop, which shall include the use of the black mangrove acreage, and which said order shall be conditioned so as to terminate within said thirty (30) days from its date in the event Lee County shall... commence condemnation proceedings in the appropriate circuit court for acquisition of the mangrove acreage below the salina.
[7] In Peterson, an applicant for a permit to fill his mangrove swamp argued during 120.57(1) hearings that permit denial would destroy all reasonable use of his land and constitute an unconstitutional taking without compensation. On the basis of the record, the hearing officer found the claim of a compensable taking unsupported.
[8] Burnette, 384 So.2d at 922-23:

[W]e shall affirm the judgment which as modified enjoins the Department's continued use of the State Road 10 drainage system in such a way as to burden this land... . Condemnation of some land or easements may be appropriate to manage this drainage in compliance with the injunction, but the manner and method of so relieving Burnette's land are for the Department to determine in the exercise of its lawful powers.
[9] Key Haven argued to the circuit court that "the state must, in order to keep from defrauding the landowner be compelled by this Court to institute condemnation proceedings against the land."
[10] Section 10 of the Federal Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and Section 404 of the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1344 (as amended by the Clean Water Act of 1977, 33 U.S.C. § 1251 et seq.), require that a permit be obtained from the United States Army Corps of Engineers before undertaking construction or filling activities in the navigable waters of the United States. In Askew v. Gables-by-the-Sea, Inc., 333 So.2d 56 (Fla. 1st DCA 1976), cert. den., 345 So.2d 420 (Fla. 1977), the State's inappropriate intervention in the Corps permitting process was a substantial factor in the decision that a taking had occurred.
[11] See Estuary Properties, 399 So.2d at 1383, where the Supreme Court discussed "investment-backed expectations of the use of the property" as an element of a "taking", but distinguished cases in which the buyer of submerged lands had at the time of purchase a statutory right to fill, Zabel v. Pinellas County Water and Navigation Control Auth., 171 So.2d 376 (Fla. 1965), or was granted a permit and then was frustrated by State interference in federal permitting processes. Askew v. Gables-by-the-Sea, Inc., 333 So.2d 56 (Fla. 1st DCA 1976), cert. den., 345 So.2d 420 (Fla. 1977).
[12] 64 Judicature 401 (1981). Authors Greanias and Windsor conclude that the courts are increasingly inclined to become activist decisionmakers, displacing the more politically responsive executive branch, because of such factors as the growth of government, increased regulation of the private sector, habitual legislative delegation of troubling questions to judicial disposition, and general skepticism about whether the political process works. The authors suggest that this policy leadership role ultimately will prove harmful to the judiciary.
[13] State ex rel. Dept. of General Services v. Willis, 344 So.2d 580, 590 (Fla. 1st DCA 1977).
[14] A. Bickel, The Least Dangerous Branch 24 (1962).
[15] In Rice, supra, a couple wanting to give their son the hyphenated surname of both parents encountered a statute which seemed to HRS to require entry of the father's surname alone on the birth certificate. By letter, an HRS supervisor had denied the couple's request, but there was no other agency action. This court remanded proceedings to HRS for entry of a final order construing the statute on the basis of a more fully developed record on specified issues. 386 So.2d at 847. Heeding the court's direction that HRS evaluate the State's interest in denying the couple's request, a DOAH hearing officer found that State interests in preserving custom, economy and administrative efficiency were not shown by evidence to be significant in comparison to the parents' interests in naming their child. Moreover, the hearing officer concluded, the statute as construed did not require exclusive use of the father's name. Finding the hearing officer's recommended order "correct and ... otherwise well advised," HRS then adopted it as its own restatement of policy and ordered the hyphenated surname entered on an amended certificate. Thus the need for further judicial review was obviated. Rice, et al. v. Dept. of Health and Rehab. Serv., 3 FALR 314-A (1981).
[1] See, e.g., Cross Key Waterways v. Askew, 351 So.2d 1062 (Fla. 1st DCA 1977).
[2] But see Rice v. Department of Health and Rehabilitative Services, 386 So.2d 844, 848 at note 6 (Fla. 1st DCA 1980).
[3] § 253.763(2), Fla. Stat. (effective May 29, 1978):

Any person substantially affected by a final action of any agency with respect to a permit may seek review within 90 days of the rendering of such decision and request monetary damages and other relief in the circuit court in the judicial circuit in which the affected property is located; however, circuit court review shall be confined solely to determining whether final agency action is an unreasonable exercise of the state's police power constituting a taking without just compensation. Review of final agency action for the purpose of determining whether the action is in accordance with existing statutes or rules and based on competent substantial evidence shall proceed in accordance with chapter 120.