# DEPARTMENT OF COMMUNITY AFFAIRS v LUJAN, et al.
## Case No. 86-1496
State of Florida, Division of Administrative Hearings
April 9, 1987

### APPEARANCES OF COUNSEL

**Ross S. Burnaman,** Florida Department of Community Affairs, for petitioner.

**Robert J. Paterno, Taylor, Brion, Buker & Greene,** for respondent Arthur B. Lujan.

**Robert Wolfe,** Assistant Monroe County Attorney, for respondent, Monroe County.

### OPINION

WILLIAM J. KENDRICK, Hearing Officer.

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, William J. Kendrick, held a public hearing in the above-styled case on December 15-17, 1986, in Key West, Florida.

## PRELIMINARY STATEMENT

This is an appeal, pursuant to Section 380.07, *Florida Statutes,* to the Florida Land and Water Adjudicatory Commission (Adjudicatory Commission) from two development orders of the Monroe County Building and Zoning Department (Monroe County) which granted the applications of Arthur B. Lujan (Lujan) for a land clearing permit and fill permit for Enchanted Island, Monroe County, Florida. The Adjudicatory Commission forwarded the Department of Community Affair's (Department's) appeal to the Division of Administrative Hearings, and requested the assignment of a Hearing Officer to conduct a hearing pursuant to Section 120.57(1), *Florida Statutes.*

The transcript of hearing was filed February 11, 1987, and the parties were granted leave, at their request, until March 3, 1987, to file proposed findings of fact. Consequently, the parties waived the requirement that a recommended order be filed within thirty (30) days of the date a transcript is filed. Rule 22I-6.31, *Florida Administrative Code.* Petitioner and Respondent Lujan filed proposed findings of fact in a timely manner, and they have been addressed in the appendix to this recommended order.

## FINDINGS OF FACT

1. Respondent, Arthur B. Lujan (Lujan) and his wife, Betty L. Lujan, are the owners of a 34.09-acre parcel of land which includes Enchanted Island its surrounding submerged lands.[1] Enchanted Island is a 3½-acre island located in Florida Bay to the east of Key Haven and north of U.S. Highway 1, Monroe County, Florida.

2. On January 15, 1986, Lujan applied to Monroe County for a land clearing permit and fill permit. The permits, as requested, would have permitted him to clear, after-the-fact, the island of vegetation, fill the island to +4' MHW (mean high water), and restore an access road to the island. Lujan's applications were approved, and the permits issued on February 4, 1986. The Department of Community Affairs (Department), pursuant to Section 380.07, *Florida Statutes,* filed a timely appeal with the Florida Land and Water Adjudicatory Commission (Adjudicatory COmmission).

### Background

3. In 1970, Lujan and his wife purchased the subject property, which included Enchanted Island and its surrounding submerged lands. At

---

[1] Title to the subject property was taken under a blind trust on behalf of the Lujan's by Henry H. Taylor, Jr., Trustee. There is no dispute, however, that the Lujans are the owners of the parcel of land in question.

191

that time, an access road connected the western tip of the island to U.S. Highway 1.[2]

4. In or about April 1972, Lujan constructed, by the deposit of fill over bay bottom, an access road from U. S. Highway 1 to the eastern tip of Enchanted Island. Since this work was being performed without a federal permit, the Department of the Army, Corps of Engineers (Corps) on April 26, 1972, advised Lujan to cease and desist all unauthorized work in navigable waters of the United States. Lujan complied with the Corps' request, but did not remove the road.

5. In late December 1972, Lujan began fill work on the western access road and on Enchanted Island itself. According to Lujan, his intention was to clearly define the boundary of Enchanted Island, raise its elevation from approximately $+3'$ MSL (mean sea level) to $+4'$ MSL, and to restore the western access road, which had been subjected to erosion. Lujan was performing the work on the access road without a federal permit, and on January 4, 1973, the Corps advised Lujan to cease and desist all unauthorized work in navigable waters.[3] In response to the cease and desist order, Lujan ceased activity on both the access road and Enchanted Island itself.[4] At that time, the boundary of Enchanted Island had been defined by a perimeter road above MHW and the access road restored, but the elevation of the island had not been raised or its interior altered.

6. Lujan further responded to the Corps' cease and desist order by filing suit in the United States District Court, Southern District of Florida (District Court) to enjoin the Corps from any further interference with the use and enjoyment of Enchanted Island. That suit was

---

[2] The access road was constructed at the time Key Haven, a small island adjacent to Enchanted Island, was under development. At that time, the bay bottom between the two islands was being used as a borrow pit. Fill from that area was extracted and stockpiled on Enchanted Island for use in filling Key Haven, as well as its connecting road to U.S. Highway 1. To access the fill the borrow pit operator constructed the access road by depositing fill on the bay bottom. When the dredging operations ceased, the access road was not removed.

[3] Corps' personnel actually stopped Lujan on January 3, 1973, but the cease and desist order did not issue until January 4, 1973. At hearing, Lujan also averred that some state agency was also involved in the work stoppage of January 3, 1973; however, he had no first hand knowledge that a state agency was actually involved and could not identify the agency purportedly involved. Consequently, there is no competent proof that the State of Florida, or any of its agencies, interfered with Lujan's activities at that time.

[4] At the time, Corps jurisdiction did not extend above mean high water. Consequently Lujan was not bound to cease his activities on Enchanted Island itself.

dismissed without prejudice when Lujan agreed to submit an after-the-fact permit application to the Corps. That application, filed May 30, 1973, sought leave to restore the western access road, place three culverts through the road, and to remove the unauthorized eastern access road and place its material on the island to bring the final elevation of the island to +4' MLW (mean low water).

7. Subsequently, on June 17, 1974, the Corps denied Lujan's permit. In February, 1975, Lujan again filed suit against the Corps in District Court seeking injunctive and declaratory relief and *de novo* review of the Corps' permit denial. The United States responded by instituting suit against Lujan for violation of the permit requirements of Section 10 of the Rivers and Harbor Act of 1899, and the Federal Water Pollution Control Act of 1972. In their action, the government sought civil penalties, and an order that the unauthorized work be removed and the area restored to its pre-existing condition. These two actions (Case Nos. 75-150-CIV-EBD and 75-635-CIV-EBD) were ultimately consolidated.

8. On December 5, 1975, the District Court ruled that the Corps' permit denial was neither arbitrary nor capricious. The court further ordered Lujan to remove the western access road and restore the area to the natural depth of the adjacent bottom, and to pay a civil penalty.[5] Lujan appealed.

9. On appeal, the United States Court of Appeals, Fifth Circuit (Appellate Court) agreed with Lujan's assertion that, *inter alia,* the Corps had breached an agreement to only consider in their determination substantive objections from the state agencies who had to be notified. The Appellate Court found the state agencies' objections to lack substance, and reversed the decision of the District Court. On remand, the Corps was instructed not to consider any previously filed objections from the state agencies since they were not specific in nature.[6]

10. Following remand, the Corps notified Lujan that viewed from the context of its 1975 regulations, the interior of Enchanted Island was deemed a wetlands area which could not be filled absent a Corps

---

[5] The eastern access road had apparently been removed by this time.

[6] Lujan charges that the State of Florida actively participated in the Corps permitting process and, therefore, is estopped from contesting the subject permits. Lujan further charges that the State of Florida conspired and colluded with the Corps to prevent his development of the island, and is therefore estopped to contest these permits. The proof fails to support Lujan's charges, or to establish the essential elements of an estoppel against the state.

permit. The District court found, however, that since the Corps acted improvidently in stopping Lujan's activities in January 1973, it would be inequitable for the Corps to retroactively apply its wetlands policy to Lujan's property. Succinctly, the court found in its order of April 26, 1985, that:

> . . . In 1972, when Lujan initially was ordered to cease work on the road, Corps jurisdiction was not exercised above MHTL. Its 1975 regulations created a "wetlands policy" which asserted jurisdiction over activities above MHTL. Had the Corps not interfered capriciously with Lujan's activities, he would have completed his fill project prior to the change in regulations and the project would have been "grandfathered in". . . . Retroactive application of the permitting requirement is not appropriate.

Consequently, the court held:

> The Corps is directed to *reopen the permit application only with respect to the western access strip* and only so that the administrative process may effectuate a reasonable restoration plan. No permitting is required as to Enchanted Island above MHTL, and the Corps is enjoined from exercising jurisdiction over the area (to the extent that Lujan's activities do not affect navigable waters, which would confer jurisdiction upon the Corps).

> The parties shall meet, formulate an agreed restoration order, and submit it to the court for evaluation within sixty (60) days of this order. (Emphasis added).

11. Lujan and the Corps experienced no difficulty in formulating an agreed restoration plan for the western access road; however, they reached an impasse when Lujan insisted that the plan include approval of his desire to fill the interior of Enchanted Island to +4' MHW. While it took no exception to the court's order that it not exercise jurisdiction over the interior of Enchanted Island, the Corps refused to agree that a provision directing the filling of the interior of the island was appropriate. According to the Corps, such matters were not a subject matter of the current litigation and could be an infringement upon county and state permitting requirements. At a hearing held November 15, 1985, at which Mr. Lujan was present, the court concurred with the Corps and directed that any language which referred to raising the existing uplands of Enchanged Island to +4' MHW be deleted.

12. Notwithstanding the court's instruction that the restoration plan contain no reference to filling the uplands of the island, the plans attached to the consent agreement still contained such language, in

194

brackets, when submitted to the court. By order of December 20, 1985, the court ratified the restoration plan, as submitted; however, by order of February 14, 1986, the court corrected its oversight by deleting the bracketed language which dealt with filling the uplands of the island.

### Current Development Activities

13. On January 6, 1986, Lujan applied with the Florida Department of Transportation (DOT) for a driveway permit which would allow him to connect the western access road through DOT right-of-way to U.S. Highway 1. Receipt of this permit was crucial to Lujan's plans, since at sometime subsequent to January 4, 1973, the portion of the western access road which occupied DOT right-of-way had been removed, creating a "water gap" in the road. On January 8, 1986, the requested permit was granted, with the following legend stamped conspicuously thereon:

VALIDITY OF THIS PERMIT IS CONTINGENT UPON PER-MITTEE OBTAINING NECESSARY PERMITS FROM ALL OTHER AGENCIES INVOLVED.

14. On January 14, 1986, Lujan began to prepare the island to receive fill. On that day Lujan filled the "water gap" in the access road and began the process of levying the high and low portions of the island by bulldozing on the southerly end of the island. It was Lujan's intention to level to the north end of the island and along the access road, and then fill and grade the island.

15. At approximately 5:30 p.m., January 14, 1986, George Garrett, a Monroe County biologist, arrived on the job site with the announced intention of red tagging it since no county permits had been obtained. In response, Lujan exhibited a copy of the District Court's order. Mr. Garrett, at that point, elected not to red tag the job site and requested that Lujan meet with his supervisor the next day.[7]

16. Mr. Garrett's request that Lujan meet with his supervisor the

---

[7] On January 14, 1986, Lujan also spoke with Randal Gru, an environmental specialist with the Florida Department of Environmental Regulation regarding his activities. Mr. Gru requested a copy of the District Court's order, which Lujan forwarded to him on that date. Subsequently, on January 16, 1986, Mr. Gru advised Lujan that:
> . . . it had been determined that dredge and fill activities at the above site, in, on, or over waters or wetlands within the landward extent of waters of the State of Florida will require a permit from the Department of Environmental Regulation prior to any work being performed.
To date, Lujan has not applied with any State agency, other than DOT, for any permits.

next day regarding the project did nothing to deter Lujan's clearing efforts. The proof establishes that when Mr. Garrett left the island on January 14, 1986, there had been some scarification at the southerly end of the island, but the mangrove community which dominated the central portion of the island, discussed *infra,* had not been disturbed. At 8:30 a.m., January 16, 1986, when the island was again inspected, the island had been cleared of most vegetation and leveled, and the mangroves which had occupied the interior of the island were now resting in several large piles of debris.

17. On January 15, 1986, Lujan met with Bob Herman, Mr. Garrett's supervisor, to discuss the activities which were occurring on the island. As a consequence of that meeting, the job site was red tagged pending Lujan's application for and receipt of Monroe County permits.

18. On January 15, 1986, Lujan filed an application with Monroe County for a fill permit which would permit him to fill the island to +4' MHW and restore the western access road, as well as a land clearing permit which would permit him, after the fact, to clear the island of vegetation. Attached to the applications were copies of the District Court's order of December 20, 1985, and the consent agreement of December 16, 1985. On each application Lujan affixed the following legend:

This application is without waiver of applicant's rights in Case Nos. 75-150-CIV-EBD and 75-635-CIV-EBD and position that no permits may be required and that such permits (if any) should be processed using 1972 county laws then in effect.

19. Lujan's applications were not accompanied by a vegetation survey and plot plan as required by Chapters 4 and 18, Monroe County Code, *infra.* The applications were, however, accompanied by a copy of the December 16, 1985, consent agreement, which contained plans for the restoration of the westerly access road. These plans delineated the areas to be filled, the location of culverts, and the location and elevations of the proposed paved access road.

20. On February 4, 1986, upon instructions from its County Attorney, Monroe County issued a fill permit and land clearing permit to Lujan despite his failure to provide a vegetation survey or disclose his development plans for the island. Each permit contained the following remarks:

Said permit issued in accord with the Federal Court Orders entered by Judge Ned Davis on the 26th day of April, 1985, and on the 20th day of December, 1985.

21. Immediately upon receipt of the county permits, Lujan began to fill the interior of the island and restore the westerly access road as rapidly as possible. According to Lujan, he had a contract to obtain fill on advantageous terms if he could promptly remove it from the Key West naval station. By February 14, 1986, auspiciously, Enchanted Island had been cleared of vegetation and its elevation raised to +4' MHW, and the access road restored. On February 20, 1986, the Department of Community Affairs (Department) noticed its appeal of the Monroe COunty permits to the Adjudicatory Commissions.[8]

### Enchanted Island

22. At the time Lujan was stopped by the Corps on January 4, 1973, the topography of Enchanted Island had been altered by the establishment of a perimeter road around its boundaries above the MHW mark, and its westerly access road restored. Mangroves fringed the island waterward of the perimeter road, but none existed along the newly restored access road. The interior of the island, located upland of the perimeter road, was not shown to have been significantly altered at that time.

23. On January 14, 1986, when Lujan began to clear and grade the island, its topography had not changed significantly from January 1973; the perimeter of the island was still defined by a roadway above MHW and the fringing mangroves waterward of the road still stood. At the center of the island, upland from the perimeter road, a depression existed which covered approximately 15-25 percent of the island's lands and which was characterized by red, black and white mangroves, as well as some buttonwood. This depression was saturated by water at a frequency and duration adequate to support its wetlands species; however, since it was located upland of the MHW mark the source of its waters was most probably from percolation and rainfall. Located elsewhere on the interior of the island were buttonwood, Bay Cedar, and sea oxeye daisy. By January 16, 1986, Lujan had cleared the interior of the island of any significant vegetation, and leveled it. The mangroves, which now fringed portions of the access road, as well as those which fringed the island, were not, however, disturbed.

### Monroe County Regulations

24. Chapter 4, Article II, of the Monroe County Code (MCC)

---

[8] During the pendency of this appeal, on April 2, 1986, Lujan received a roadway permit from DOT. Under that permit, Lujan did substantial works along U.S. Highway 1. Such works are, however, not relevant to this proceeding and, further, were commissioned at his peril.

establishes and regulates development within a shoreline protection zone. Pursuant to Section 4-18, MCC, the zone is established as follows:

> There is hereby established a shoreline protection zone in all that portion of the county defined in Section 22F-8.02, Florida Administrative Code, and generally known as the Florida Keys. The shoreline protection zone includes submerged lands covered by the waters of the Atlantic Ocean and the Gulf of Mexico (Florida Bay) out to the seaward limit of the State's territorial boundaries, whether in sovereign or private ownership, including those lands contiguous to such waters where fringing mangrove communities occur. In order to maintain the functional integrity of these mangrove communities, the interior boundary of the shoreline protection zone is hereby established at a line extending fifty (50) feet laterally upland from the landward limit of the shoreline mangroves. The shoreline mangroves shall include mangrove communities which contain red (Rhizophora mangle), black (Avicennia nitida) or white (Laguncularia racemosa) mangroves but excluding those mangrove communities which are isolated inland and separated from open water areas by nonmangrove natural vegetative communities.

Consequently, all of the western access road and the portion of Enchanted Island lying within 50' upland from the landward limit of the shoreline mangroves are within the shoreline protection zone. The mangroves which occupied the depressed area in the central portion of the island were not, however, within the zone.

25. Permittable uses within the shoreline protection zone are delineated by sections 4-19 and 4-20, MCC, as follows:

Sec. 4-19. Permitted uses in zone.

Only the following uses are permitted within the shoreline protection zone established by this article:

(1) Access canals or channels;

(2) Docks;

(3) Elevated boardwalks;

(4) Other structures elevated on pilings;

(5) Utility lines, crossing or rights-of-way.

Sec. 4-20. Uses permitted upon special approval; special exception uses.

(a) The following uses are permitted by special approval of the zoning board as provided by the provisions of chapter 19, article IV of this Code of Ordinances.

Access driveway and turnarounds for single-family residences.

(b) [Additionally] . . . the following standards shall also be met before the zoning board may grant approval for a special exceptions use within the shoreline protection zone:

(1) The principal structure shall be located as close as possible to the landward edge of site so as to reduce driveway length.

(2) All access driveways and turnarounds shall provide for piped culverts under the access driveway and/or turnaround at appropriate intervals so as to maintain tidal regime.

26. To secure a permit for development within the shoreline protection zone, whether for a permitted use or special exception use, it is incumbent upon the applicant to comply with the provisions of section 4-21, MCC. That section provides:

(a) No development permit of any kind shall be issued to any person to undertake any development within the shoreline protection zone without first obtaining a zoning clearance from the zoning official.

(b) An application for any development permit within the shoreline protection zone shall be referred to the zoning official. The materials to be referred to the zoning official shall include the following, in duplicate:

(1) Proposed site plan

(2) A natural vegetation map

(3) Other information as may be appropriate to determine the impact of the development on the natural functions of the shoreline protection zone.

(c) The placement of landfill within the shoreline protection zone is hereby prohibited and no permit shall be issued authorizing the same, except as provided in section 4-20 of this article.

(d) No application for a zoning clearance shall be approved and no permit shall be issued except upon a written finding by the zoning

**199**

board[9] that the proposed development will not encroach upon or destroy the value of areas within the shoreline protection zone or otherwise adversely affect those conditions and characteristics which promote shoreline stabilization, storm surge abatement, water quality maintenance, wildlife and marine resource habitats, and marine productivity.

27. Lujan's proof in support of his request for a fill permit within the shoreline protection zone was deficient. He offered no natural vegetation map or proposed site plan, and offered no proof that his proposed activity would not encroach upon or destroy the value of the shoreline protection zone or otherwise adversely affect shoreline stabilization, storm surge abatement, water quality maintenance, wildlife, and marine habitats, and marine productivity. Significantly, Lujan also failed to disclose his plans for the development or use of the island. Absent proof that the fill activity is designed to create an access driveway or turnaround for single-family residences, the deposit of fill within the shoreline protection zone is prohibited.[10] Section 4-21(c), MCC.

28. Under the circumstances, it is concluded that Lujan has failed to demonstrate that he is entitled to a special exception use which would permit the deposit of fill on the westerly access road or upon those lands lying within 50' upland from the landward limit of the shoreline mangroves (the shoreline protection zone). Lujan's failure to disclose the nature of his plans to develop the island also rendered it impossible to evaluate the criteria established by section 4-20(b)(1), MCC.

29. The deposit of fill within those areas of Enchanted Island lying upland of the shoreline protection zone is governed by chapter 19, *MCC.* Pertinent to this proceeding, section 9-111, MCC, provides:

(a) Deposit of Fill. No person shall engage in the deposit of fill within the unincorporated areas of Monroe County, without first having obtained a county permit for such activity.

(1) Definitions.

---

[9] Some provisions of the Monroe County code require approval by the building and zoning department, while others require approval by the zoning board of Board of County Commissioners. In this case all permits were issued by the building and zoning department. The Department suggests that because the appropriate level of county government did not approve the subject permits that they are void. The Department's assertion is unpersuasive. Where, as here, a *de novo* review of the permit applications is undertaken, the applicant is entitled to the permits if he can demonstrate compliance with the applicable development regulations.

[10] Should Lujan not desire to commit the island to single-family residential use, he could have access through construction of an elevated roadway. Sec. 4-19, MCC.

Deposit: The act of placing, discharging or spreading any fill material.

Fill: Any material used or deposited to change elevation or contour in upland areas, create dry land from wetlands or marsh in an aquatic area, or material discharged into a body of water to change depth or benthic contour.

* * *

Uplands: Land areas upon which the dominant vegetative communities are other than species which require saturated soil for growth and propagation.

Wetlands: Marshes and shallow areas which may periodically be inundated by tidal waters and which are normally characterized by the prevalence of salt and brackish water vegetation capable of growth and reproduction in saturated soil, including but not limited to the following species:

* * *

Black mangrove

* * *

Buttonwood

* * *

Red mangrove

* * *

White mangrove

* * *

(3) Upland permit application.

In reviewing all applications for a permit in upland areas, consideration will be given to the nature of indigenous vegetation, and protection of same as defined in chapter 18 of the Monroe County Code, which set standards for the removal of endangered and protected vegetative species, and to drainage patterns and the possible effects the deposit of fill would have upon water and storm runoff.

* * *

(4) Wetland permit application.

In reviewing all applications for a permit in wetland areas, consideration will be given to the natural biological functions, including food chain production, general habitat, nesting, spawning, rearing and resting sites for aquatic or terrestrial species; the physical aspects of natural drainage, salinity and sedimentation patterns, physical protection provided by wetland vegetation from storm and wave action. The proposal will also be reviewed in conjunction with chapter 4 of the Monroe County Code, which provides for the protection of wetland vegetative communities within Monroe County.

30. When reviewing applications for fill permits, whether within or without the shoreline protection zone, the provisions of Chapter 18, MCC, and the Monroe County Comprehensive plan, which deal with land clearing, must also be evaluated. Pertinent to this case, chapter 18 provides:

Section 18-18. Land clearing permit—Required . . .

(a) It shall be unlawful and an offense against the county for any person, either individually or through agents, employees or independent contractors, to clear, by mechanical or any other means, any land located within the unincorporated areas of the county without having first applied for and obtained a land clearing permit from the building department of the county.

(b) A land clearing permit shall be required for the removal of all or parts of naturally occurring vegetation in the county.

* * *

Sec. 18-19. Same—Application . . .

(a) Any person requesting a land clearing permit shall file an application with the county building department on a form provided by such department. Such application shall contain the following information:

* * *

(5) A map of the natural vegetative communities found on and adjacent to the site, prepared by a qualified biologist, naturalist, landscape architect or other professional with a working knowledge of the native vegetation of the Florida Keys. . . . With projects that are five (5) acres or more in size, the vegetation map does not have to identify the location of individual trees. For projects of this size, the vegetation map should identify the different vegetative communities, such as tropical hammock,

202

mangrove and buttonwood transitional, and be accompanied by a descriptive narrative that identifies any significant trees or natural features of the side (sic).

(6) An overall site plan of the land for which the permit is requested, indicating the shape and dimensions of said land, the purposes for which clearing is requested, and the steps taken to minimize effects of clearing on surrounding vegetation and water bodies. A site plan analysis prepared by a qualified individual, as described above in (3), shall be included.

\* \* \*

Sec. 18-21. Same—Approval.

After an application for a land clearing permit has been filed and verified, the building department and the planning and zoning department shall review and consider what effects such removal of vegetation will have upon the natural resources, scenic amenities and water quality on and adjacent to the proposed site. Upon finding that such removal of natural vegetation will not adversely affect the natural resources, scenic amenities and water quality adjacent to the proposed site, the permit shall be approved, approved subject to modification or specified conditions, or denied. In the event a request is denied, the reasons for denial shall be noted on the application form and the applicant shall be so notified.

Pertinent to this case, the Monroe County Comprehensive Plan, Coastal Zone Protection and Conservation Element, provides:

NATURAL VEGETATION MANAGEMENT POLICIES

1. In recognizing the need to preserve as much natural vegetation as possible, the County will direct its land use and development regulations to minimize destruction of natural vegetation and modification of landscape.

1.1 Guidelines and erformance standards designed to protect natural vegetation from development will be developed and enforced.

1.2 Clearing of native vegetation for development will be controlled.

1.3 Land clearing will be restricted to site area being prepared for immediate construction. If the construction cannot begin within reasonable time, the cleared area will be replanted with ground cover.

**203**

\* \* \*

3. Regulations controlling development in areas characterized primarily by wetland vegetative species such as mangrove and associated vegetation will emphasize preservation of natural vegetation to the maximum degree possible. Local regulations in this regard will be consistent with the appropriate State and Federal regulations.

\* \* \*

8. The existing County ordinances designed to protect and conserve natural vegetation will be strictly interpreted, rigidly enforced, and/or amended when necessary.

31. Lujan violated the provisions of sections 9-111 and 18-18, MCC, when he, without benefit of a permit, leveled and cleared Enchanted Island of vegetation. Now, after the fact, he requests the appropriate fill and land clearing permits; however, he offers no vegetation map, no plan to mitigate the removal of endangered and protected species, and no proof as to the drainage patterns on the island and the probable effect the deposit of fill or the removal of vegetation would have upon storm runoff or water quality.

32. While no vegetation map was submitted, the proof at hearing did establish the general nature of the vegetation existent on the island prior to clearing. That proof established that the mangrove community previously located at the center of the island reposed in relative isolation, and that its natural biological functions were nominal. Consequently, the removal of that vegetation was not counterindicated from the biological function perspective; however, the impact of such removal and the filling of that area on storm runoff and water quality was not addressed by Lujan. Further, Lujan offered no plan to mitigate the impact caused by his removal of Bay Cedar, an endangered species.

33. With respect to the access road, Lujan offered no vegetation survey, and the proof was insufficient to identify the location of the mangroves, a protected species, which fringe its banks. Consequently, the proof was insufficient to assure that only minimal clearing would occur. Additionally, Lujan offered no proof concerning the impact that such removal, if any, and the deposit of fill would have on drainage patterns, storm runoff, or water quality.

34. The premises considered, it is concluded that Lujan has failed to demonstrate his entitlement to a fill permit or land clearing permit for Enchanted Island and the access road. In addition to the reasons set forth in paragraphs 27-28, *supra,* Lujan has also failed to address the issues of storm runoff and water quality.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties to, and the subject matter of, these proceedings.

2. This is an appeal, pursuant to Section 380.07, *Florida Statutes,* from two development orders of Monroe County granting Lujan's application for a fill permit and land clearing permit in an area of critical state concern. Pursuant to the provisions of Section 120.57(1), *Florida Statutes,* a *de novo* hearing was held. *Transgulf Pipeline Co. v. Board of County Commissioners,* 438 So.2d 876 (Fla. 1st DCA 1983).

3. Pertinent to this appeal, Section 380.06(13), *Florida Statutes,* provides that where, as here, the proposed development is located in an area of critical state concern,

> . . . the local government shall approve it only if it complies with the land development regulations therefor under s. 380.05 and the provisions of this section.

Chapter 27F-8, *Florida Administrative Code,* the Boundary and Principles for Guiding Development for the Florida Keys Area of Critical State Concern; Chapter 22F-9, *Florida Administrative Code,* the Land Planning Regulations for the Florida Keys Area of Critical State Concern Monroe County; and, Monroe County's comprehensive plan and zoning regulations are the land development regulations pertinent to Section 380.05, *Florida Statutes,* and the proposed development.

4. Although revised comprehensive plan and land development regulations were adopted by Monroe County on February 28, 1986, and approved, as amended, on September 15, 1986, by the Department and the Administration Commission, such plan and development regulations are not applicable, over Lujan's objection, to the current proceeding. Lujan's applications were processed by Monroe County prior to the effective date of its new regulations, the Department's appeal was noticed under the prior regulations, and the Department made no request, prior to hearing, that current regulations be considered. Consequently, Monroe County regulations existent when Lujan's application was considered by the county will be applied in this case.[11]

5. The ultimate burden of persuasion rested on Lujan to establish his

---

[11] Lujan's assertion that, if permits are required, the land development regulations in force in 1972 should be applied is unpersuasive. *See: State, Department of Environmental Regulation v. Oyster Bay Estates, Inc.,* 384 So.2d 891 (Fla. 1st DCA 1980). There is no competent proof to demonstrate that the State of Florida, or more importantly Monroe County, interfered with Lujan's early attempts to develop his property in such a manner as to cause a "vesting" of any development rights or to "grandfather" Lujan's project.

entitlement to the permits authorizing him to clear Enchanted Island of natural vegetation and to fill the island and westerly access road. *Graham v. Estuary Properties, Inc.,* 399 So.2d 1374 (Fla. 1981), and *Florida Department of Transportation v. J.W.C. Co., Inc.,* 396 So.2d 778 (Fla. 1st DCA 1981). Lujan has failed to demonstrate that his proposal complies with the land development regulations applicable to this case.

6. In reaching the conclusion that Lujan has not demonstrated entitlement to the subject permits, I am not unmindful of the District Court's orders. That court's decision, however, directed the reopening of the Corps' permitting file for the purpose of resolving a permitting dispute between the Corps and Lujan, premises on a finding that the Corps had acted arbitrarily and capriciously in denying his permit to restore the western access road, and that it would be inequitable, under the circumstances, to allow the Corps to exercise jurisdiction over the interior of the island. Consequently, the Corps was directed to develop a restoration plan for the western access road with Lujan, and refrain from exercising jurisdiction over the interior of the island. The court's orders did not authorize the clearing or filing of the interior of the island, and did not purport to consider or resolve the need for collateral permits which might be needed under Monroe County's development regulations or those of the State of Florida.

7. While Lujan's battle with the Corps was protracted, the result was essentially the issuance of a Corps permit for the repair of the westerly access road. The possession of such authorization did not, however, relieve Lujan of the responsibility of complying with other developmental regulations applicable to the subject property.

8. Lujan's assertion that the Department is collaterally estopped or barred by the doctrine of *res judicata* by virtue of the District Court proceedings is rejected. There exists neither identity of parties between that litigation and this proceeding, nor is there an identity of issues.

9. Lujan's assertion that the Department is estopped from pursuing this action based on his claim that the State of Florida, or its agencies, conspired or colluded with the Corps to effect a half to the development of Enchanted Island in 1973 is rejected as not supported by the proof. Other than responding as requested by the Corps, no agency of the State of Florida was shown to have participated directly or indirectly in the Corps' handling of its permitting process, or the Federal litigation, or to have conspired or colluded to effect a halt to the development of Enchanted Island.

10. While not entitled to the requested permits, Lujan is entitled to a

**206**

specification of what changes in his proposal are necessary that would make it eligible to receive a permit. Section 380.08(3), *Florida Statutes.* Based on the evidence adduced at hearing, such changes are as follows:

A. Prepare and submit a natural vegetation survey of the island and access road in accordance with Chapter 18, MCC, and provide reasonable assurances that clearing will be minimized and will not adversely impact the natural resources, scenic amenities and water quality on and adjacent to the site.

B. Prepare and submit a site plan depicting the proposed development and use of the island, and provide reasonable assurances that the proposed development and fill activities will not adversely affect natural resources or water quality.

C. To secure a land clearing and fill permit within the shoreline protection zone that Lujan provide reasonable assurances that the access road is dedicated for use solely as an access way or turnaround for single-family residences; that the principal structures will be located as close as possible to the landward edge of the site so as to reduce driveway length; that the access way provide for piped culverts at appropriate intervals so as to maintain tidal regime; and, that shoreline stabilization, storm surge abatement, water quality, and marine resources habitat and marine productivity, on or adjacent to the site, will not be adversely impacted.

D. Prepare and submit a plan to mitigate the prior removal of Bay Cedar, an endangered species.

E. Should the permits issue, provide reasonable assurances that the cleared and filled areas be replanted in ground cover if the development of Enchanted Island should not begin within a reasonable time.

### RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED:

That the Florida Land and Water Adjudicatory Commission enter a Final Order reversing Monroe County's decision to issue the subject permits No. 14723A and 1472A, and deny Lujan's request for a land clearing and fill permit for Enchanted Island and the westerly access road. That such Final Order specify those items set forth in paragraph 10, Conclusions of Law, as the changes necessary that would make Lujan's proposal eligible to receive the requested permits.

DONE AND ORDERED this 9th day of April, 1987, in Tallahassee, Florida.